No. 82,110

STATE OF KANSAS, *Appellee*, v. TONY BRANDON HUNT, *Appellant*.

(14 P.3d 430)

Opinion filed December 8, 2000.

*Kathleen A. Downey*, of The Law Office of John J. Ambrosio, Chartered, of Topeka, argued the cause, and *John J. Ambrosio*, of the same firm, was with her on the brief for appellant.

*Julie A. McKenna*, county attorney, argued the cause, and *Carla J. Stovall*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Tony Hunt was convicted by a jury of second-degree murder (K.S.A 1999 Supp. 21-3402) and attempted first-degree murder (K.S.A. 21-2401 and K.S.A. 21-3301). He appeals his convictions. He argues that the trial court erred by failing to instruct the jury on (1) voluntary manslaughter as a lesser included offense of first-degree murder, (2) self-defense as a defense to the charge of first-degree murder, and (3) aggravated battery as a lesser included offense of attempted first-degree murder.

In the early morning hours of June 13, 1997, Lamar Williams died from a gunshot to the back of his head, and the woman he lived with, Jannette Gardenhire, was injured by a gunshot to her head. Tony Hunt was convicted by a jury of second-degree murder of Lamar Williams and attempted first-degree murder of Gardenhire.

Tony Hunt and Lamar Williams became acquainted through a mutual friend, Adam Crist, who shared with Williams an interest in breeding and raising pit bull terriers. Williams began working with Tony Hunt at the beginning of 1997. They worked for Tony Hunt's father, Richard Hunt, who had a construction business.

Tony Hunt testified that in February 1997 Williams revealed to him that he sold drugs for a man named Marcus Madden in Bakersfield, California. Williams also told him that he had collected money for Madden, which on occasion had involved kidnapping someone. When Williams asked Hunt if he would be interested in helping him sell marijuana, Hunt said he would.

At the end of April or the beginning of May, Williams got a quantity of marijuana. Hunt took 10 pounds of it, Williams took 10 pounds, and Williams was going to hide the rest of it. Hunt paid nothing at the time he took the marijuana.

Hunt also testified that in April Williams told him that Marcus Madden had asked Williams if Hunt could sell 20 pounds of methamphetamine. Williams said that he could.

Hunt testified that several days after he took the marijuana Williams began telling him that Madden was upset that they had not yet sold the shipment. Madden also was mad because they had not sold the methamphetamine. Hunt eventually sold 8 of the 10 pounds he had taken, gave 2 pounds back, and paid Williams the amount they had agreed on for 10 pounds. The day that Hunt paid Williams, Hunt thought some of Madden's people were coming to get his money and the remainder of the marijuana shipment. Hunt thought his involvement in selling drugs was over.

In May 1997, Williams told Hunt that someone had sold 5 pounds of the methamphetamine, but they had to sell the remaining 15 pounds. Williams related anecdotes to Hunt about the ruthlessness of the people supplying the drugs.

Also in May, Williams received another shipment of marijuana, and Hunt took 10 pounds. Hunt paid nothing at the time he took the marijuana. Hunt testified that, because the market in Salina was glutted, he was unable to sell the marijuana. Hunt was "paying for what [he] had gotten," but he had to say no to Williams on several occasions when he asked if Hunt had money to buy methamphetamine.

In June, Williams told Hunt that the California people were angry because Hunt had not come up with any money to buy the methamphetamine. On Friday, June 6, Williams returned to Hunt a .357 Magnum handgun that Hunt earlier had sold to Williams. Williams told Hunt that he would need the gun and that Madden was threatening to kill him. Williams said that he would ask Madden if there was a possibility that Hunt "could just buy [his] way out of this" instead of buying the methamphetamine. It was Hunt's understanding that he had to pay for what he had "ordered," whether he ever got it or not.

On Monday, June 9, Williams told Hunt that Madden would let him "buy out" for $20,000 if Hunt could get the money by Friday, June 13. If Hunt did not have the money by that Friday, Williams was going to take Heather Gerard, Hunt's fiance, to Oklahoma to stay with a man called Hitler until Hunt came up with the money. Williams said that he would "pitch in" $12,000 because he did not want anything to happen to Taylor, the daughter of Gerard and Hunt. Hunt testified that he believed what Williams told him.

Hunt testified that on Tuesday evening, June 10, Williams withdrew his offer to contribute money toward the $20,000. He told Hunt that Madden had forbidden him from helping.

Richard Hunt testified that on Wednesday, June 11, Tony Hunt asked him for $7,500 to pay off some drug dealers he and Williams had gotten involved with. Tony Hunt told his father that the total amount was $20,000. He said that Williams had $12,500 and he needed $7,500. Richard Hunt advised his son to go to the authorities. On June 12, Tony Hunt told his father that he needed $20,000.

On Wednesday, June 11, Tony Hunt telephoned Charles Walker, who at one time had had some structures built by Hunt Con-

struction on his ranch. At one time, Walker had employed Tony Hunt for several months during a time when Hunt and his father were having a conflict with each other. The telephone call on June 11 was the first time since then that Walker had heard from Tony Hunt. Hunt told Walker that a "black fella" got him involved in delivering packages, which to his surprise contained drugs. Hunt asked Walker for $20,000, which Hunt would use to get out of the business. Walker advised Hunt to go to the authorities. On Thursday, June 12, Hunt talked to Walker again and told Walker he wanted to turn himself in. Walker called the sheriff for Hunt. A meeting was scheduled for the morning of Saturday, June 14, which was the earliest time the sheriff and the Drug Enforcement Agency agents would be available to meet with Hunt.

Walker suggested that Hunt borrow a vehicle, take his family to a nearby town, and stay in a motel. Hunt was to return for the meeting with authorities, which was to take place in Walker's office.

Williams went to where Hunt was working on Thursday and told Hunt that Madden was very angry. Williams showed Hunt a gun, pointed it at him, and said "it would be this easy to kill you." They went to a pay phone to call Hitler, and Hunt listened to Williams ask whether he (Williams) was still expected to be in Oklahoma City at 3:45 p.m. As Williams was driving Hunt back to his job, Hunt told Williams that he had a meeting scheduled with his banker at 4:45 p.m. and that he would be by at 5 p.m. to give him the money. In fact, due to a lack of collateral, Hunt had not been able to get a loan.

At 5 p.m. on Thursday, Heather Gerard met Hunt at Hunt Construction. While Gerard and their daughter Taylor waited, Hunt went somewhere with Lamar Williams and his brother Anthony. When they returned, Hunt parked his truck and with his father's permission took one of his father's trucks. Hunt, Gerard, and Taylor drove to Troy Holcomb's house and asked him to follow them to Minneapolis, Kansas, and he agreed. In Minneapolis, Holcomb went into the motel office with Gerard to register.

Hunt called Crist from the motel, and Crist told him Williams had a new deal that Hunt needed to come into town and talk to Williams about. Hunt later "decided . . . to go back into town to

try to talk to Lamar again." Hunt testified that he then went back into town because he thought "it could be worked out" between him and Williams.

Jannette Gardenhire was awakened by someone knocking. She woke Williams, who answered the door and let Hunt in. She heard Williams offer Hunt a Pepsi, and then she asked Williams to close the bedroom door.

Hunt testified that Williams talked about bad things the drug suppliers could do to Hunt and his family and that Williams said he thought Hunt "was doing something stupid like going to the police." When Williams asked if he had any money, Hunt said that he did and that he would go to his house to get it. Williams asked if Hunt had a gun on him and said Hunt "wasn't going anywhere without him." When Hunt went to use the bathroom, he heard Williams talking about getting his "heater" and his shoes, and he heard Gardenhire "telling him to hurry up or something."

When Williams came out of the bedroom, he had a gun. Hunt was looking out the window, and Williams told him to get away from the window. Williams sat down on the edge of a chair, put his gun on the floor, and leaned over to tie his shoes. Hunt walked behind Williams and shot him. Hunt then went to the bedroom and shot Gardenhire. Hunt testified that he fired a shot from the bedroom door and ran. When Hunt got back to the motel, he told Gerard that Williams had been getting ready to take him out into the country, that he had shot Williams and Gardenhire, and that he thought they both were dead.

Gardenhire testified that she heard a gunshot. As she was getting out of bed, Hunt opened the bedroom door and came in. He put his hand on her arm, asked her what happened, pushed her back onto the bed, and shot her in the side of her head. When Gardenhire regained consciousness, she used the telephone in the bedroom to call police. She found Williams' body on the living room floor. When police arrived at 3:51 a.m., she was on the living room floor.

Gardenhire's wound consisted of a large laceration from just behind her right ear to her forehead, with smaller lacerations branching off from the primary one. It came very close to being a

fatal injury but was not deadly because the bullet did not penetrate her skull.

An autopsy showed that Williams died from a gunshot that entered the back of his head. The gun likely was fired from less than a foot away. Toxicological tests revealed no sign of drugs or alcohol in Williams' system.

A .38 caliber handgun was found on the living room floor approximately 3 to 4 feet from Williams' body. The gun was not loaded. Ammunition for a .38 caliber handgun was found by police in a pocket of the shorts Williams was wearing. A search of Williams' house revealed no drugs, no quantities of money, and no business records from drug sales.

Hunt first argues that the trial court should have instructed the jury on voluntary manslaughter as a lesser included offense of first-degree murder.

Hunt was charged with premeditated first-degree murder for Williams' death. In addition to premeditated first-degree murder, the trial judge instructed the jury on intentional second- degree murder. The jury convicted Hunt of intentional second-degree murder.

At the instructions conference, defense counsel asked the trial court to give an instruction on voluntary manslaughter, PIK Crim. 3d 56.05. The trial court judge refused to instruct on voluntary manslaughter on the ground that it was not supported by the evidence.

Under K.S.A. 21-3107(3), which was effective when Hunt was tried in June 1998, the trial court was required to instruct on lesser crimes "of which the accused might be found guilty under the information or indictment and upon the evidence adduced." In *State v. Spry*, 266 Kan. 523, 528, 973 P.2d 783 (1999), the court stated: "Such an instruction must be given even though the evidence is weak and inconclusive and consists solely of the testimony of the defendant. *State v. Follin*, 263 Kan. 28, 33, 947 P.2d 8 (1997). However, the duty to so instruct arises only where there is evidence supporting the lesser crime. *State v. Shannon*, 258 Kan. 425, 427, 905 P.2d 649 (1995)." When this court considers a trial court's refusal to give a specified instruction, the evidence is viewed

in the light most favorable to the party requesting the instruction. *State v. Sims*, 265 Kan. 166, 168, 960 P.2d 1271 (1998).

K.S.A. 21-3403 defines voluntary manslaughter as "the intentional killing of a human being committed . . . (b) upon an unreasonable but honest belief that circumstances existed that justified deadly force under K.S.A. 21-3211 . . . ." The circumstances described in K.S.A. 21-3211 are restricted to a defendant's "use of force against an aggressor when . . . such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force."

Evidence that would have supported an instruction on voluntary manslaughter would have shown that Hunt honestly, if unreasonably, believed that Williams was the aggressor and that it was necessary for Hunt to shoot Williams to defend himself against Williams' imminent use of unlawful force. Hunt directs the court's attention to evidence of his long-term, escalating fear and evidence that Williams had a gun. The State highlights Hunt's own testimony that Williams was tying his shoes and did not have a gun in his hand at the time Hunt shot him. The evidence shows that Hunt shot Williams in the back of the head at close range. Even viewed in the light most favorable to Hunt, the evidence in this case would not support a finding that at the time he shot Williams he honestly believed Williams was an aggressor and that it was necessary for Hunt to kill him to defend himself.

Hunt also seeks to expand this "defense" to take into account more than just the immediate circumstances of his killing Williams. He has argued that stories that had been related to him about the ruthlessness of the drug suppliers he was dealing with had made him generally fearful for his own and his family's safety. The supposedly frightening context in which he acted, however, lends no credence to his defense. With the help of Charlie Walker, Hunt had an appointment to talk with the sheriff and drug enforcement agents. In the meantime, at Walker's suggestion, Hunt had removed himself, his girlfriend, and his daughter from harm's way. But Hunt chose not to stay out of harm's way. On his own volition, Hunt armed himself, left the motel room in Minneapolis, drove to Salina, and went to Williams' house in the middle of the night.

Thus, the defendant's own actions in the "bigger picture" as well as in the immediate circumstances of Williams' death run counter to the defense he asserts. The trial court did not err in refusing to instruct on voluntary manslaughter.

The trial court also refused Hunt's request for a self-defense instruction. On appeal, Hunt argues that under K.S.A. 21-3211 he was entitled to a self-defense instruction. For the same reasons stated in the discussion of issue one as to why the evidence would not support a voluntary manslaughter instruction, the evidence would not support a self-defense instruction.

Hunt also requested that the jury be instructed on attempted second-degree murder and aggravated battery as lesser included offenses of attempted first-degree murder of Gardenhire. The trial court instructed only on attempted first-degree murder. On appeal, Hunt complains that the trial court should have instructed on aggravated battery. He does not argue that an instruction on attempted second-degree murder should have been given.

Conceding that in *State v. Daniels*, 223 Kan. 266, 573 P.2d 607 (1977), the court held that aggravated battery is not a lesser included offense of attempted murder, Hunt argues that the question should be reconsidered. He contends that in *State v. Adams*, 242 Kan. 20, 744 P.2d 833 (1987), and *State v. Fike*, 243 Kan. 365, 757 P.2d 724 (1988), the court changed the test for determining lesser included offenses. In *Adams*, the court held in the circumstances of that case that under K.S.A. 21-3107(2)(d), the offense of DUI was a lesser included offense of involuntary manslaughter. 242 Kan. 20, Syl. ¶ 2. The statute provided in part: "An included crime may be any of the following: (a) A lesser degree of the same crime; (b) an attempt to commit the crime charged; (c) an attempt to commit a lesser degree of the crime charged; or (d) a crime necessarily proved if the crime charged were proved." K.S.A. 21-3107(2)(d)

Subsequently, in *Fike* this court adopted a two-step approach for determining lesser included crimes under K.S.A. 21-3107(2)(d):

"In determining whether a lesser crime is a lesser included crime under K.S.A. 1987 Supp. 21- 3107(2)(d), the first step relies solely on the *statutory* elements of the crime charged and the crime which is asserted to be a lesser included crime

thereof. If the statutory elements of the two crimes do not meet the statutory elements analysis, then the second step requires the facts as alleged in the charging document *and* as must be proven at trial to be considered." 243 Kan. 365, Syl. ¶ 2.

We noted that the two-step analysis was not utilized in previous opinions of this court:

"Much of the confusion that has arisen in the application of K.S.A. 1987 Supp. 21-3107(2) may be traced to opinions which have referred to the 'identity of the elements test' without recognizing that the statute in some cases may require more than simply an analysis of the statutory elements. The first step in the analysis relies solely on the *statutory* elements of the crime charged and the statutory elements of the crime which is asserted to be a lesser included crime. If the statutory elements of the two crimes do not meet the statutory elements analysis then the facts as alleged in the charging document *and* the facts which must be proven at trial must be considered." 243 Kan. at 369.

*Daniels* was one of those cases in which only the first step was applied. Following the decision in *Fike*, this court applied the two-step approach in determining lesser included offenses. The second prong of the *Fike* test was eliminated in 1998 by an amendment to K.S.A. 21-3107, but the crime in this case occurred prior to that amendment.

In *State v. Williams*, 268 Kan. 1, 988 P.2d 722 (1999), the defendant was convicted of two counts of first-degree premeditated murder and four counts of attempted first-degree murder. Williams' request that the jury be instructed on aggravated battery as a lesser offense of premeditated first-degree murder and of attempted first-degree murder had been denied by the trial court. On appeal, this court flatly rejected Williams' contention with regard to the counts of first-degree murder and stated:

"In the context of a multiplicity analysis, Justice McFarland, in *State v. Smith*, 245 Kan. 381, 391-92, 781 P.2d 666 (1989), stated that an act of first-degree premeditated murder by means of shooting, beating, or stabbing, etc. requires proof of an aggravated battery. Where the victim survives the shooting, beating or stabbing, the charge could be attempted murder or aggravated battery but not both. Where a victim dies from an aggravated battery, a homicide has occurred and the battery merges into the homicide." 268 Kan. at 16.

This court, applying the two-step approach, concluded that the jury should have been instructed on aggravated battery as a lesser included offense of attempted first-degree murder. 268 Kan. at 19.

As in the present case, in *Williams* the effective version of 21-3107 still retained subsection (2)(d). The court's principal inquiry was whether the State had proved attempted first-degree murder as alleged in the complaint; that is, was each of the four injured victims struck by shots fired by Williams? Indeed, the evidence showed that each of the injured victims had been struck by shots fired by Williams. Thus, the evidence necessarily proved aggravated battery. Under 21-3107(2)(d), therefore, aggravated battery was a lesser included offense of attempted first-degree murder, as charged. 268 Kan. at 19.

In the present case, Hunt was charged in count 2 with attempting to kill Jannette Gardenhire "by shooting her in the head." As in *Williams*, in the present case, when the State proved attempted first-degree murder as alleged in the complaint, it necessarily proved aggravated battery. Therefore, as Hunt was charged, aggravated battery is a lesser included offense of attempted first-degree murder. Based on *Williams* and pursuant to K.S.A. 21-3107(2)(d), the trial court would have an affirmative duty under 21-3107(3) to instruct the jury on aggravated battery as a lesser included offense charged and established by the evidence. However, such an instruction is not required if, from the evidence, the jury could not reasonably convict the defendant of aggravated battery.

In *State v. Perry*, 266 Kan. 224, 230-31, 968 P.2d 674 (1998), the defendant argued on appeal that although he had not raised the matter at trial, the jury should have been instructed on aggravated battery as a lesser included offense of attempted first-degree murder. The court stated that the trial court's duty to instruct on lesser included offenses was limited to instances where the evidence would justify a verdict in accordance with the defendant's theory and did not exclude a theory of guilt on the lesser offense. 266 Kan. at 231. Because it found that the jury could not reasonably have convicted Perry of aggravated battery, the court concluded that no instruction was required on that offense:

"Here, the evidence was that Perry beat Rogena into unconsciousness and then shot her in the head. He then proceeded upstairs where he shot and killed Dana

Richards. After shooting Dana, Perry stomped on her skull. Perry then shot Lori in the stomach and in the head.

"The evidence is clear that Perry's intent was not to cause great bodily harm or disfigurement to the victims; he intended to kill the victims." 266 Kan. at 231.

Hunt testified that he shot Williams and "then I walked to the bedroom and I just fired a shot from the door, but the evidence doesn't show that I know and then I ran." On cross-examination the State questioned Hunt as follows:

"Q. You then go to the bedroom, and according to your testimony, which you say the evidence doesn't show it, you fired a bullet from the doorway.

"A. That's what I thought happened, ma'am.

"Q. What do you mean thought happened?

"A. It's a very hard time to remember.

"Q. Well, think real hard about going over to the bedroom and shooting Jannette Gardenhire. Did you fire from the doorway?

"A. I thought that I did.

"Q. Well, let's not have you thought. Tell the jury what you did.

"A. I'm telling you, ma'am. I—that's what I thought that had happened.

"Q. You thought that you just stood in the doorway of the bedroom and fired at her?

"A. Yes, ma'am.

"Q. You've heard her testify that you walked over to her [and] said, Jannette, what happened, you pushed her down on the bed, you pull up the gun, you put it to her head and you fired.

"A. If she says that I believe her, ma'am.

. . . .

"Q. You made a decision then after you shot Lamar Williams that you were going to go into the bedroom and eliminate any threat against you by shooting Jannette Gardenhire?

"A. Yes, ma'am.

"Q. She had not done anything to you that evening?

"A. No, ma'am.

"Q. Hadn't threatened you in any way?

"A. No, ma'am.

"Q. Hadn't pulled a gun on you in any way?

"A. No, ma'am.

"Q. She was in fact in her bedroom asleep, was she not?

"A. It's very, very hard for me to remember exactly what happened at that point. I've been trying. It's at a blank."

Heather Gerard testified that Hunt told her that he had shot both Williams and Gardenhire in the head. She asked him if they

were both dead, and he replied, "yeah." Given that Hunt is not sure what occurred and conceded Gardenhire's version of the shooting, there is no evidence he intended to do anything other than kill Gardenhire. We conclude the jury could not have reasonably found Hunt guilty of aggravated battery. Thus, the trial court was not required to instruct the jury on aggravated battery as a lesser included offense of attempted first-degree murder.

Affirmed.