No. 97,065

STATE OF KANSAS, *Appellee*, v. BRAD JONES, *Appellant*.

(198 P.3d 756)

Opinion filed December 12, 2008.

*Carl E. Cornwell*, of Cornwell & Scherff, of Olathe, was on the brief for appellant.

*Steven J. Obermeier*, assistant district attorney, argued the cause, and *Phill Kline*, district attorney, and *Stephen N. Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: This direct appeal arises out of the tragic death of Jonathan U, who suffered crush injuries when he came to the aid of a purse snatching victim in the parking lot of a Johnson County discount department store. As a result of these events, defendant Brad Jones pleaded guilty to two felony counts of robbery, one felony count of theft, and one felony count of fleeing and eluding, leaving only a felony-murder charge for trial. Jones was convicted by a jury and was sentenced to a life term plus a consecutive 176 months.

Jones raises three questions: (1) Did the district judge err in disallowing testimony by the victim's wife on her observations regarding the quality of U's medical care? (2) Does newly discovered evidence regarding a medical malpractice case filed by U's wife merit a new trial? and (3) Did the district judge err in denying a defense request for an instruction on aggravated battery as a lesser included offense of felony murder?

## Factual and Procedural Background

Ruth Peck had just finished unloading items she had purchased from Target into her trunk when defendant Jones grabbed her purse. Peck shouted for help, and U responded by chasing Jones, who still had the purse, to Jones' car. When Jones jumped into his vehicle, U reached into the car to take hold of Peck's purse. Jones then sped away with U half inside and half outside of the car. When Jones ran his car into a brick wall, U was pinned between the open car door and the frame of the car. Jones then fled on foot with the purse. Another individual pursued Jones, who eventually dropped the purse and was apprehended by law enforcement. U, gravely hurt, was rushed from the scene to the hospital. He died 18 days later.

At Jones' trial on felony murder, the prosecution argued that U's death was caused by complications stemming from the injuries he sustained during Jones' flight from the robbery of Peck; in the

State's view, regardless of whether Jones intentionally steered his car into the wall to get rid of U or simply lost control of the car, Jones' actions were the direct and proximate cause of U's death.

The defense theory at trial was that U's death was caused not by his injuries but by negligent medical treatment of those injuries, *i.e.*, an infection diagnosed too late. In support of this theory, the defense attempted to introduce evidence that U's wife, Stephanie Sandgren, had consulted with legal counsel about the quality of the medical treatment her husband received. The State filed a motion in limine to prevent introduction of this evidence, arguing that it invaded attorney-client privilege.

Defense counsel framed his intended line of questioning in three ways before the district court. He first stated: "All I requested the Court to allow me to do is to ask Ms. U, did she contact an attorney, and was there some particular reason for that." Counsel restated his intent: "All I want to ask is: did you consult an attorney about observations you made while your husband was in the hospital? Just yes or no." After the district court ruled against him, counsel stated: "[J]ust so the record is clear, my tack was to ask her if she consulted with an attorney, no conversation and that was all."

The district judge ruled that the substance of the conversation between Sandgren and the lawyer was privileged and that the only possible relevance of the mere fact of their contact would be its tendency to give rise to an adverse inference about the quality of U's medical care, which had virtually no probative value. The judge then advised the parties to look to medical evidence, rather than evidence of the contemplation of legal action, to support their arguments about the existence of an intervening cause of U's death.

The district judge also overruled defense counsel's request to limit the State's presentation of evidence on the underlying felony of robbery, reasoning that the State had a right to prove the robbery and flight from it. Thus several witnesses testified about the purse snatching and its aftermath. Peck was among those witnesses. In addition, she told the jury that she had visited U every day while he was in the hospital, that he was not doing well, and that he did not appear to be recovering.

Sandgren testified that she spent time at the hospital with her husband and that there was no improvement in his condition from the time he went into the hospital until he died. He was never able to consume any nourishment, solid or liquid; and was concerned about surviving. He underwent three surgeries, among other treatments and tests.

Dr. Michael Handler, a forensic neuropathologist with the Johnson County Coroner's Office, performed an autopsy on U's body. Handler noted that U had been subject to substantial medical intervention, including resection of a portion of his small bowel and insertion of a plate to repair a pelvis fracture. Handler also noted a number of injuries and abnormalities, including fluid and peritonitis in U's chest cavity; fluid in U's heart; clotting in U's lungs; hemorrhage in U's liver; blockage and death of U's right kidney; clots to the veins of U's prostate; and a 1-centimeter perforation of U's large bowel, which, when opened, revealed an infection Handler termed pseudomembranous colitis. Handler observed this pseudomembranous colitis in both U's small and large bowels.

Handler testified specifically that pseudomembranous colitis is difficult to diagnose and that it develops rapidly. It is linked to the use of antibiotics; when they are used to treat infection, they destroy many bacteria but leave a particular, naturally occurring bacteria without competition. This bacteria overpopulates the bowel and leads to pseudomembranous colitis which, in turn, results in damage, necrosis, and eventual perforation of the bowel. Once such a perforation occurs, fecal material contaminates the abdominal cavity, often resulting in a fatal infection. Handler further testified that pseudomembranous colitis can be treated with an aggressive antibiotic called Vancomycin.

Handler also testified that U's development of pseudomembranous colitis was merely the last link in a chain of events starting with the crush injuries. Even with medical intervention, Handler said, U's ability to survive had been fatally compromised. Had he not been admitted to the hospital, or had he been released from the hospital on any of the 18 days he managed to survive, he still would have died from his injuries. Handler ultimately opined that the cause of U's death was "complications of blunt force injury of the

thorax and abdomen sustained in a pedestrian, motor-vehicle collision." U's injuries, in Handler's view, were consistent with a severe crush and complications arising therefrom.

Dr. Steven Behrends, a surgeon who acted as U's primary care physician during his time in the hospital, also appeared at trial. He testified extensively about U's course of treatment, explaining that there was a tremendous amount of swelling in the first few days after admission and that U never really became stable before his death. Behrends specifically addressed the last of U's surgeries, which Behrends performed 3 days before U's death. After that surgery, U developed sepsis, an overwhelming infection in the bloodstream that caused U's vital organs to shut down. In his summary of U's treatment and complications, Behrends cited the sepsis, peritonitis, kidney failure, severe edema and excessive fluid in the tissues, distention of the abdomen, and jaundice. He also noted that U had entered the hospital with two life-threatening injuries: a pelvic fracture and a laceration to his duodenum.

Behrends also testified that there was no evidence of pseudomembranous colitis when he performed U's last surgery and that this condition would have developed after that procedure. Behrends had read Handler's autopsy report and disagreed with its pseudomembranous colitis conclusion. Behrends believed it was more likely that peritonitis, ischemic colitis, or sepsis precipitated U's death. Behrends agreed with Handler that, if U had not gone to the hospital or had been released from the hospital at any point in the 18 days he was there, he would still have died. Behrends also agreed that Vancomycin is used to treat pseudomembranous colitis. Apparently as a precaution, U had received Vancomycin following his last surgery, which enabled Behrends to opine that Vancomycin could not have saved U's life.

The defense presented the testimony of Dr. James Bryant, a pathologist who had reviewed more than 1,700 pages of U's medical records, including Handler's autopsy report. Bryant had not been present at the autopsy, nor had he worked with any of the tissue samples. Bryant testified that the proximate cause of U's death was pseudomembranous colitis. Specifically, Bryant testified that the immediate cause of death was peritonitis, which was

caused by the perforation in U's bowel from the colitis. Bryant opined that, although Vancomycin was given to U, nothing in the medical records indicated why it was prescribed; there had been no cultures done, no lab tests run, and no diagnosis. Bryant testified that Vancomycin is administered as a "third line" treatment after penicillin and another antibiotic called Metronidazole are not effective; those were not attempted here. According to Bryant's review of medical literature, pseudomembranous colitis has a very low mortality rate, and once diagnosed, can be treated in a number ways. Here, he said, because there was no diagnosis, there was no treatment for the condition. Bryant opined that, had U's health care providers done more than they did, they could have discovered the pseudomembranous colitis and prevented the perforation that led to U's death.

On cross-examination, Bryant disagreed with the autopsy report conclusion that U's death was caused by the crush injuries because, in Bryant's opinion, those injuries had been repaired. Although he agreed the crush injuries were life-threatening, they were not the immediate cause of death. Bryant ultimately agreed, however, that, had U been released from the hospital on any of the 18 days he was there, he would not have survived.

The State offered rebuttal testimony from Dr. Frank Mitchell, III, a general surgeon acting as the director of the trauma unit of St. Luke's Hospital in Kansas City. Mitchell discussed the nature of crush injuries versus penetrating injuries or lacerations. He had reviewed U's file, and he opined that there was significant damage to the tissues, evidenced particularly by tears in the duodenum. Such an injury would require surgery to put the bowel back together, which, among other concerns, would raise the specter of infection. Ultimately, Mitchell opined, the medical care U received was good, and the physicians making the decisions about that treatment were responding appropriately to U's symptoms. Neither CAT scans nor the pathology of the 6-inch portion of U's bowel removed during his last surgery showed any suggestion of pseudomembranous colitis or other inflammation. Mitchell opined that the critical nature of U's condition "had very little, if anything, to do with . . . pseudomembranous colitis," which had been over-

emphasized in the autopsy report. Mitchell testified that U's initial injuries were massive and that the potential complications associated with those injuries had unfortunately happened to occur in U's case.

The jury's instructions included non-PIK instructions on felony murder, in accord with *State v. Mays*, 277 Kan. 359, 85 P.3d 1208 (2004).

Instruction No. 12 stated: "Time, distance and the causal relationship between the underlying felony and the killing are factors to be considered in determining whether the killing was done while in flight from the robbery."

Instruction No. 13 stated:

"The theory of the defense is that negligent treatment by physicians at the Overland Park Regional Medical Center was the sole proximate cause of death of Jonathan U and not the injuries he sustained at the Target Store parking lot. You are instructed that if you find the defendant did cause the injuries inflicted on the person of Jonathan U, then you must determine whether the acts of the defendant contributed to the death of Jonathan U. If you find defendant's acts contributed to the death of Jonathan U, then responsibility cannot be avoided by the fact that independent causes such as negligence of others also contributed to the death. However, if you find the proximate cause of death resulted solely from erroneous treatment of the physicians, you must acquit the defendant."

Instruction No. 14 stated:

"Where the original injuries are a proximate cause of the death, the fact that the immediate cause of death was the medical or surgical treatment administered or that such treatment was a factor contributing to the cause of death will not relieve the person who inflicted the original injury from responsibility."

Instruction No. 15 stated: "The fact, if it be a fact, that some other person was guilty of negligence which was a contributory cause of the death involved in the case, is no defense to a criminal charge."

Instruction No. 16 stated:

"To constitute felony murder, defendant's actions must be a proximate cause of death of Jonathan U. The proximate cause of a death is a cause which, in natural and continuous sequence, produces the death and without which the death would not have occurred. There may be more than one proximate cause of death. When the conduct of two or more persons contributes concurrently as proximate causes of a death, the conduct of each of said persons is a proximate cause of death

regardless of the extent to which each contributes to the death. A cause is concurrent if it was operative at the moment of death and acted with another cause to produce the death."

The defense objected to Instruction No. 14 as redundant. Jones also requested an instruction on aggravated battery as a lesser included offense of felony murder, because of the parties' dispute on proximate cause. He argued that, without such an instruction, there was no charge to fit his theory of defense, *i.e.*, that U died because of negligent medical care. The district judge declined to give an aggravated battery instruction, observing that lesser included offense instructions should not be given in felony-murder cases unless evidence of the underlying felony is weak or inconclusive.

### Testimony of Victim's Wife

Jones' first argument on this direct appeal is that his counsel should have been allowed to question Sandgren about her consultation with a lawyer about the quality of her husband's medical care. He asserts that the district judge's refusal to allow this line of questioning on the ground of attorney-client privilege, see K.S.A. 60-426, violated his due process right to present a defense, namely, that the proximate cause of U's death was medical malpractice rather than his flight from felonious conduct. Jones further asserts that this question is reviewable by this court de novo.

Although earlier cases have not been abundantly clear on the standard of appellate review applicable to a district judge's ruling on the existence and effect of attorney-client privilege, we agree with Jones that, when the underlying facts are undisputed, as they are here, the existence and effect of such a privilege is reviewable by us de novo. See *Butler v. HCA Health Svcs. of Kansas, Inc.*, 27 Kan. App. 2d 403, 436-37, 6 P.3d 871 (1999).

That being said, regardless of whether a privilege existed to prevent disclosure of either the fact of Sandgren's contact with a lawyer or of the content of her discussion with that lawyer, exclusion of any responses Sandgren would have given to questions from defense counsel on this issue, however the questions or responses had been phrased, was inconsequential. Jones' jury heard a great

deal of testimony about U's injuries, about the multiple complications that arose from them, and about the dispute among medical experts regarding the causal chain leading to U's death. By comparison, the information Jones hoped to add from Sandgren's testimony would have been minimally probative on the medicine or the causation involved in this case. When a district judge allows a criminal defendant to present evidence supporting his or her theory of defense such that the jury could reach a conclusion on its validity, exclusion of other evidence is not necessarily error. See *State v. Lawrence*, 281 Kan. 1081, 1086-87, 135 P.3d 1211 (2006); compare *State v. Irons*, 250 Kan. 302, 309, 827 P.2d 722 (1992) (reversing conviction when motion in limine completely " 'choke[d] off a valid defense in a criminal action' "). Here, the district judge's evidentiary ruling against Jones, even if it could be characterized as legal error, a question we do not decide, was harmless well beyond a reasonable doubt. See *Chapman v. California*, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) (harmless error standard for constitutional claims).

### Newly Discovered Evidence

Jones also argues for the first time on this appeal that he is entitled to a new trial based on newly discovered evidence because he has learned that Sandgren actually did file a civil suit against U's treating physicians and the hospital. He appends a copy of her petition to his brief.

The State asserts, *inter alia,* that a newly discovered evidence argument cannot be raised for the first time on appeal and that an appendix to an appellate brief is no substitute for the record on appeal.

The State is right on both counts. Generally, issues not raised before the district court cannot be raised for the first time on appeal. *State v. Shopteese*, 283 Kan. 331, 339, 153 P.3d 1208 (2007). Should Jones wish to pursue this argument, he should first do so by way of motion in the district court. Moreover, material annexed to an appellate brief by way of an appendix that does not appear in the record on appeal cannot be considered. Supreme Court Rule 6.02(f) (2007 Kan. Ct. R. Annot. 37); *In re Gershater*, 270 Kan.

620, 633-34, 17 P.3d 929 (2001). We thus do not address the merits of this claim.

## Lesser Included Offense Instruction

Jones' final argument is that his jury should have been instructed on aggravated battery, a violation of K.S.A. 21-3412, as a lesser included offense of felony murder. He asserts that there was sufficient evidence presented at trial to support a guilty verdict on this crime and that his conviction of it would have been consistent with his theory of defense that he injured but did not cause the death of U.

First-degree felony murder is "the killing of a human being . . . in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A. 21-3436 and amendments thereto." K.S.A. 21-3401(b). Robbery is an inherently dangerous felony that can support a felony-murder conviction, K.S.A. 21-3436(a)(3), and it was the underlying felony described in the charging document controlling trial of this case. Jones pleaded guilty to two counts of robbery before he went to trial on felony murder.

The rule for lesser included offense instructions in felony-murder cases is:

"When murder is committed during the commission of a felony, the rule requiring instructions on lesser included offenses does not apply. The felonious conduct is held tantamount to the elements of deliberation and premeditation which are otherwise required for first-degree murder. It is only when the evidence of the underlying felony is weak, inconclusive, or conflicting that instructions on lesser included offenses may be required. [Citations omitted.]" *State v. Branning*, 271 Kan. 877, 887, 26 P.3d 673 (2001) (quoting *State v. Strauch*, 239 Kan. 203, 218-19, 718 P.2d 613 [1986]).

See *State v. Edgar*, 281 Kan. 47, 58, 127 P.3d 1016 (2006); *State v. Boone*, 277 Kan. 208, 219, 83 P.3d 195 (2004).

In felony-murder cases, " '[t]he analysis of whether the jury should have been instructed on lesser included offenses includes two steps.' " *Edgar*, 281 Kan. at 60. The first step is to evaluate the strength of the evidence of the underlying felony, and " '[i]f the evidence of the underlying felony was strong, no instruction on the

lesser included offenses need have been given.' " *Edgar*, 281 Kan. at 60; *State v. Oliver*, 280 Kan. 681, 703, 124 P.3d 493 (2005).

It is only if the evidence of the underlying felony is not strong that the court then moves to the second step of considering "whether there was evidence on which a jury could have found the defendant guilty of the lesser included offenses." *Edgar*, 281 Kan. at 60; see also *State v. Boone*, 277 Kan. at 220 (quoting *State v. Sims*, 262 Kan. 165, 172, 936 P.2d 779 [1997]).

Jones' lesser included offense argument is completely without merit for at least three reasons.

First, regarding the first step, the evidence of the underlying felony of robbery in this case was as strong as it could ever be. Jones had already pleaded guilty to the underlying crime. In addition, although no more was needed, the State presented numerous eyewitnesses who testified about the purse snatching and attempted intervention that led to U's crush injuries. Under these circumstances, we need not proceed to the second step of the analysis for the appropriateness of a lesser included offense instruction in a felony-murder case.

If we were to proceed, the second fatal weakness in the argument is immediately apparent. Aggravated battery, the crime on which Jones insists his jury should have been instructed, was not, as a matter of law, a lesser included offense of felony murder based on the underlying crime of robbery.

Third and finally, the instructions as given in this case adequately protected Jones' due process right to present—and obtain a verdict consistent with—his theory of defense. Instruction No. 13 informed jurors:

"[I]f you find defendant did cause the injuries inflicted on the person of Jonathan U, then you must determine whether the acts of the defendant contributed to the death of Jonathan U. If you find defendant's acts contributed to the death of Jonathan U, then responsibility cannot be avoided by the fact that independent causes such as negligence of others also contributed to the death. However, if you find the proximate cause of death resulted solely from erroneous treatment of the physicians, you must acquit the defendant."

Under this instruction and the others quoted above, had the jury accepted Jones' theory, it had an avenue to express that acceptance:

acquittal. The jury did not choose this avenue. That was its prerogative.

In view of all of the above, the judgment and sentence of the district court are affirmed.

JOHNSON, J., concurring: I agree with the majority's result, including its determination that a lesser included offense instruction on aggravated battery should not have been given in this case. I write separately only to document that I have misgivings about the court-made rule governing lesser included offense instructions in ·felony-murder cases, *i.e.*, the giving of lesser included offense instructions is driven in the first instance by the relative strength of the evidence of the underlying felony.

The general rule is that a criminal defendant is entitled to an instruction on all lesser included offenses which are supported by trial evidence. *State v. Simmons*, 282 Kan. 728, 741-42, 148 P.3d 525 (2006). Indeed, we have said such instructions should be given even though the evidence of the lesser included offense is weak, inconclusive, and consists solely of the defendant's testimony. *State v. Hunt*, 270 Kan. 203, 208, 14 P.3d 430 (2000). The felony-murder rule turns the analysis on its head by focusing on the evidentiary support for the charged crime, rather than looking at the evidence to support the lesser included crime.

This court has explained that the reason for the exceptional rule in felony-murder cases is that " '[a] defendant's commission of the underlying felony supplies elements which must be absent from the lesser degrees of homicide, and a jury should be instructed only on lesser offenses of which the defendant reasonably may be convicted.' *State v. Altum*, 262 Kan. 733, 738, 941 P.2d 1348 (1997)." *State v. Edgar*, 281 Kan. 47, 57, 127 P.3d 1016 (2006). To me, that rationale would support the notion that lesser degrees of homicide or other intentional crimes against persons simply are not lesser included offenses of the unique crime of felony murder. It does not lead me to the extraordinary rule focusing on the strength of the evidentiary support for the underlying felony.