No. 76,734

STATE OF KANSAS, *Appellee*, v. VINCENT D. ALTUM, *Appellant*.
(941 P.2d 1348)

Opinion filed July 11, 1997.

*Mary D. Prewitt*, assistant appellate defender, argued the cause, and *Wendy L. Rhyne Slayton*, special appellate defender, and *Jessica R. Kunen*, chief appellate defender, were on the brief for appellant.

*Debra S. Peterson*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Vincent Altum appeals his conviction by a jury of one count of felony murder. The underlying felony count, abuse of a child, was dismissed by the district court following trial. Altum was sentenced to life imprisonment.

The defendant, Vincent Altum, lived with Toni Lynne Phipps and her 14-month-old son, Dylan Cox. When Phipps was at work, Altum, who was unemployed, watched Dylan. Phipps testified that when she arrived home from working the lunch shift on November 1, Dylan was asleep. Altum was in the living room of their apartment playing with his radio-controlled cars. After awhile Phipps heard Dylan moaning. When he was picked up, his neck was limp but his body was stiff and "he was moving his arms and legs like he was riding a bicycle." Phipps testified that she immediately wanted to take Dylan to the hospital, but that Altum resisted on the ground that Dylan's bruises might raise a suspicion of child abuse. At Altum's direction, Phipps went instead to the store for

Tylenol for Dylan. About mid-afternoon, Altum and Phipps took Dylan to the emergency room at Riverside Hospital.

Dr. Curtis Pickert first saw Dylan Cox at approximately 5 p.m. on November 1, 1995, when Dylan arrived by ambulance at Wesley Medical Center. Because Dylan's arms and legs flailed about in a nonpurposeful way, his eyes opened and closed absent any indication that he was seeing, and his breathing was erratic, it was obvious to Dr. Pickert that the child's brain was not functioning properly. Initial examination of Dylan revealed a number of bruises on his head, bruising on his left arm and scapula, many bruises on his buttocks, and red lesions on a hand and foot. The top of Dylan's head was mushy, which indicated bleeding under the skin. A CT scan, which was made immediately, showed significant swelling of his brain, bleeding within the skull, and signs of bleeding within the brain.

A pediatric neurologist and a neurosurgeon were consulted for the purpose of determining whether Dylan's condition could be improved by surgery. They concluded that he was very near death and that surgery was not indicated. His condition was rapidly deteriorating. Dylan was put on a respirator to keep him breathing. "[A]n all-out attempt" was made to save his life by controlling the pressure in his brain.

A pediatric ophthalmologist examined Dylan and confirmed that he had extensive retinal hemorrhages in the backs of both eyes. Dr. Pickert explained that retinal hemorrhages often are associated with shaken baby syndrome, but may be caused by any trauma that causes a small child's head to move suddenly in one direction and then in another.

At the hospital, Dr. Pickert interviewed Phipps. She told him that about 6:30 p.m. on October 30, approximately 48 hours before Dylan had been brought to the hospital, he had collided with Altum's knee. Phipps was at work at the time. When she got home after 10 p.m., Dylan seemed to be fine. Phipps told Dr. Pickert that Altum said Dylan had fallen back, then forward. Dylan was somewhat dazed but then roused and seemed to be all right. At trial, Phipps testified that she arrived home from work at 11 p.m. on October 30, that Dylan was asleep, and that she did not look

closely at him until the following day, when she saw a bruise on his forehead.

Altum's mother testified that she checked on Dylan the evening of October 30 after being told by Phipps that she was concerned about Dylan's hitting his head on Altum's knee. Altum's mother further testified that when she saw Dylan on the morning of November 1, she advised Phipps and Altum to take him to the hospital because he had a purplish color above his eye. This was a separate injury, Altum's mother believed, from the one she had seen on October 30. Although she was in the apartment for 20-25 minutes on November 1, she did not take Dylan out of his playpen or examine him. Altum's mother stated that Phipps was reluctant to take Dylan to the hospital.

Dr. Pickert testified that a blow to Dylan's head by Altum's knee would not explain many of the physical findings. Dr. Katherine Melhorn, a pediatrician who was consulted in this case due to her expertise in evaluation of children suspected of being abused, testified that Dylan's many bruises were not inflicted all at the same time, which indicated a pattern of abuse. With regard to the head injuries, Dr. Pickert was of the opinion that the child had received multiple blows to his head, some "of a very severe nature." Dr. Pickert further testified that the injuries were not consistent with an accident that had occurred 48 hours earlier. Dr. Melhorn agreed. Nor were the injuries consistent with Dylan's being fine at times after the injury, as Phipps described. In particular, Dylan's critical state upon arrival at the hospital and subsequent rapid deterioration led Dr. Pickert to conclude that the injury actually occurred close to the time medical care had been sought.

Altum gave a statement to the police on November 3. First, he answered the police officer's question about Dylan's running into his knee on Monday, October 30. Then, after initially denying that anything unusual had happened on Wednesday, November 1, Altum told the officer that he had hit Dylan. He said that while Phipps was at work he had become angry because Dylan would not stop crying. He hit Dylan in the head, knocking him to the floor. Then he hit Dylan three more times while he was on the floor. Altum told police that the first blow was

"with his right fist to the back portion of the top of Dylan's head. The second blow he delivered with his left fist to the right side of Dylan's head. The third blow was delivered with the right fist to the left side of Dylan's head and the fourth blow was delivered with the right fist to Dylan's forehead area."

Altum told police, "I hit him hard."

In spite of the medical efforts, Dylan's brain continued to swell. On November 3, there was no evidence of brain function. The next morning, on November 4, the complete lack of brain function was confirmed. Dylan was pronounced dead, and the life support system was removed. An autopsy performed on November 4 showed even more extensive bruising of the scalp than had been visible on the external surface of the head. The pathologist testified that it appeared that there had been "multiple impact[s] between that head and another object." There were accumulations of blood between the skull and the surface of the brain. The brain was so swollen that it had forced its way downward into the neck through the hole at the base of the skull. The pathologist believed that Dylan showed signs of shaking injuries as well as impact injuries. In the opinion of the pathologist, "Dylan Cox died of blunt force injuries of the head and shaking injuries of the head." He testified that the injuries were consistent with child abuse and inconsistent with the account of the child's running into an adult's knee. He further testified that four blows to Dylan's head would explain some but not all the head injuries.

Dr. Melhorn agreed with the pathologist's conclusions. She testified that Dylan "had such severe bruising on the outside of his scalp, it was clear that there had to have been some type of impact to his head also and not just a shaking injury."

Altum first contends that the jury should have been instructed on lesser included offenses. Altum filed proposed jury instructions that included instructions on the lesser included offenses of second-degree murder and involuntary manslaughter. During the instruction conference, however, defense counsel did not object to the trial court's failure to instruct on lesser included offenses. Nor did defense counsel object to the verdict form, which permitted the jury only the choice between guilty and not guilty of first-de-

gree murder. The jury was instructed only on the offense of first-degree murder.

The established rule with regard to the need for lesser included offense instructions in felony-murder cases is that they are not required unless the evidence of the underlying felony is weak or inconclusive. *State v. Thomas*, 252 Kan. 564, 578, 847 P.2d 1219 (1993). In the present case, the underlying offense was abuse of a child. The jury was instructed that the essential elements of that offense were that the defendant intentionally tortured, cruelly beat, or inflicted cruel and inhuman bodily punishment on Dylan Cox, who was under the age of 18. In *State v. Hupp*, 248 Kan. 644, 809 P.2d 1207 (1991), relied on by the State in this appeal, the court considered the question of whether the trial court should have instructed on lesser included offenses in a felony murder case based on child abuse. Among the principles stated by the court in *Hupp* is that a specific intent to injure is not a required element of child abuse because "[i]t is the act of hitting and hurting that is made a crime." 248 Kan. 644, Syl. ¶ 8. The court further concluded that "[c]hild abuse does not require more than one blow." 248 Kan. 644, Syl. ¶ 9.

In *Hupp*, the evidence was entirely circumstantial. The court noted that circumstantial evidence may sustain a conviction of the gravest offense. 248 Kan. at 652. The evidence against Hupp showed that an otherwise healthy baby of approximately 4 months of age died from a head injury, that on previous occasions Hupp became angry in response to the baby's crying and physically punished him, and that Hupp made statements which could have been interpreted as incriminating. Contrary evidence included Hupp's trial testimony denying that he hit the baby and the mother's testimony that she had hit the baby's head on a doorknob. The mother's testimony was subject to question because she was shown to have given different versions of her story at different times. No error was found in the trial court's failure to instruct on lesser offenses.

In the present case, the medical evidence indicated that the child had been severely beaten and shaken. The type and extent of his injuries did not permit a reasonable conclusion that the injuries

were accidentally inflicted. The only question was who had abused the child. Evidence indicating that it was Altum who beat and shook the child included Altum's own statement. Although the defense conjectures that the child's mother may have inflicted the injuries, evidence supporting this theory is inconclusive, at best. It consists primarily of instances of Phipps' evading questions or giving inconsistent accounts. In addition, the jurors heard Altum's mother contradict Phipps' accounts and they heard the testimony of several witnesses about Phipps' apparent lack of concern for her son's condition. In other words, an unflattering picture of her general character and trustworthiness was painted. Evidence that would have linked her to the abuse that killed Dylan, however, is missing.

In support of his position that evidence that he abused Dylan was so inconclusive that instructions on lesser offenses were required, Altum notes that Dylan died from being beaten and shaken, but he admitted only beating him. This argument is self-defeating because beating a 14-month-old child is abuse, with or without shaking him. Moreover, there was testimony from which the jury could have believed that forceful blows could have caused the retinal hemorrhages typically seen in shaken babies. Altum also argues that he did not intend to cruelly beat the child. This argument has no merit because the only intent required for the offense of abuse of a child, as in this case, is the act of hitting. See *Hupp*, 248 Kan. 644, Syl. ¶¶ 7 and 8. Thus, evidence of the underlying felony of child abuse was not weak or inconclusive. Under the established rule in a felony-murder case, the jury need not be instructed on lesser offenses unless evidence of the underlying felony is weak and inconclusive. A defendant's commission of the underlying felony supplies elements which must be absent from the lesser degrees of homicide, and a jury should be instructed only on lesser offenses of which the defendant reasonably may be convicted. In *State v. Masqua*, 210 Kan. 419, 425, 502 P.2d 728 (1972), *cert. denied* 411 U.S. 951 (1973), the following explanation was given:

"The state's theory was that he had committed a murder while perpetrating a felony (forcible rape). Homicide while committing a felony is the statutory equivalent to the deliberation and premeditation essential to murder in the first degree.

It follows that if the appellant was present at the rape, the mere participation in that felony would supply the elements of deliberation and premeditation, both of which must be absent from second degree murder and manslaughter. Either the rape was perpetrated by the appellant and he necessarily is responsible for the murder, or he was not present at the rape where the killing occurred and not guilty of any degree of homicide."

In the present case, the State charged Altum with committing a murder while perpetrating a felony—abuse of a child. Applying the reasoning from *Masqua* in the circumstances of this case, if Altum perpetrated the child abuse, his role in that felony would supply the elements of deliberation and premeditation, both of which must be absent from second-degree murder and manslaughter. Thus, either the child abuse was perpetrated by Altum and he necessarily is responsible for the murder, or he did not perpetrate the child abuse where the child's death was caused and is not guilty of any degree of homicide. In this case, the evidence of Altum's committing the offense of child abuse was neither weak nor inconclusive, and there was no call for instructions on lesser degrees of homicide.

Altum next argues that his statement should have been suppressed on the ground that it was given in response to a promise. In the trial court, Altum filed a motion to suppress statements he had made to police. The stated grounds for suppression were that he had not been advised of his rights as required by *Miranda* and he had not waived those rights. At the hearing on the motion to suppress, an advice and waiver form bearing Altum's signature was introduced by the State. Defense counsel then argued that there had been two objectionable interrogations. With regard to interrogation at police headquarters, defense counsel argued that even though the signed form showed that Altum had been advised of his rights, the statement he gave there should be suppressed because it was coerced rather than volunteered. The defense theory of coercion was that Altum made his statement on the strength of a promise by the police that they would vouch for his cooperativeness if he changed his story. It appears that the story he was supposed to change was that Dylan's head collided with Altum's knee on October 30. Defense counsel also argued that Altum had been

questioned and had given information to the police at the hospital. The argument why the hospital interrogation should be suppressed remained the police officer's failure to advise Altum of his rights.

The district court denied the motion. Noting that defense counsel's argument went beyond the scope of the motion, the court stated:

"[T]he subject matter of the motion is declarations against interest made to police officers once the investigation had focused on this particular individual, Mr. Vincent D. Altum.

"So that part of it, as I think we're dealing with, those statements set out in State's Exhibit No. 4 [the signed form], I'll find that those were voluntarily, knowingly, intelligently made and that they are proper insofar as qualified to be proffered into evidence to have the jury consider their weight."

The district court continued:

"I don't know what the declarations at the hospital were. Since he was not arrested, I'm going to go ahead for the purpose of this motion only and assume that they were not inculpatory, that they were made in the general course of business on a police matter trying to ascertain the facts."

Although not expressly stated, it appears that the statement at issue on appeal is the statement given by Altum at police headquarters. There, he told the officers that he used his fists to hit Dylan on the head while Phipps was at work on November 1. Altum contends that his statement "was improperly induced by the detectives' declaration assuring Mr. Altum that he would not be able to tell the jury and judge that Mr. Altum cooperated if he stuck to his story."

Altum concedes that the statement was introduced into evidence at the trial without objection. The general rule followed by this court is as follows: "When either a motion in limine or a motion to suppress is denied, the moving party must object to the evidence at trial to preserve the issue on appeal." *State v. Milo*, 249 Kan. 15, Syl. ¶ 2, 815 P.2d 519 (1991). Altum has failed to preserve the issue in this appeal. We note in passing that if the issue were properly before us, the inquiry would center on what the detective said to the defendant and how likely it would be to cause defendant to give a false statement. The detective's testimony on what he said was quoted in appellant's brief as follows: "I told Mr. Altum if he stuck to that story, that he was going to look foolish in court, that

I wasn't going to be able to tell the judge or the jury that he co-operated in the investigation."

It is Altum's contention that a promise was made to him and that the promise pertained to a consequence of the crime charged. There is an implication in the detective's statement that he would not be able to tell the judge or the jury that Altum cooperated in the investigation if Altum stuck to the story that the only incident he knew of involving injury to Dylan was the collision with his knee. That implication is simply the positive aspect of the detective's statement—that he would be able to tell the judge or the jury that Altum cooperated in the investigation if Altum gave additional information about how Dylan was injured. His being able to tell them is not a promise to do so, however. In *State v. Johnson*, 253 Kan. 75, 82, 853 P.2d 34 (1993), the court considered the voluntariness of a statement made after the interrogating officer told defendant he could not make any deals, he could only " 'go to the DA and tell the DA if the person is cooperating or not . . . in the investigation.' " The court concluded that the officer "did not bargain with or promise the defendant anything by implication or otherwise." 253 Kan. at 84. There would seem to be no measurable difference between the statement made to Johnson and the statement at issue in the present case.

Even assuming that a promise was implied, it seems highly unlikely that it would have produced any profound effect upon defendant. The benefit to defendant is negligible. Even if one assumes that cooperation in the investigation would be a factor favoring leniency in sentencing or would cause the judge and/or jury to view the defendant somewhat less disfavorably, defendant's relief would be meager relative to the crime charged. In this regard, Altum argues that at the time the promise was made, the crime charged was child abuse, not murder. The statement was given in the afternoon of November 3, at a time when tests already had shown that Dylan's brain had ceased to function. He was alive by virtue of the life-supporting machines to which he was connected. There was little, if any, hope for his survival. Thus, in effect, defendant's assertion that "[h]e was 'confessing' only to hitting the child, not to murder" is meaningless.

Finally, Altum complains of the admission of six autopsy photographs. One of those photographs, State's Exhibit 34, is not in the record on appeal. Examination of appellate counsel's request for additions to the record shows that State's Exhibit 34 was not included. "'An appellant has the burden of furnishing a record which affirmatively shows that prejudicial error occurred in the trial court. In the absence of such a record, an appellate court presumes that the action of the trial court was proper.'" *State v. Richardson*, 256 Kan. 69, 84, 883 P.2d 1107 (1994) (quoting *State v. Milo*, 249 Kan. 15, Syl. ¶ 1, 815 P.2d 519 [1991]).

State's Exhibits 35-39 are photographs of Dylan's head at progressive stages of the autopsy. The rule governing admissibility of photographs of this kind recently was stated in *State v. Sutton*, 256 Kan. 913, Syl. ¶ 3, 889 P.2d 755 (1995):

> "The law is well settled in this state that, in a crime of violence which results in death, photographs which serve to illustrate the nature and extent of the wounds inflicted are admissible when they corroborate the testimony of witnesses or are relevant to the testimony of a pathologist as to the cause of death, even though they may appear gruesome."

In the present case, Dylan's death was attributed by the pathologist to traumatic head injuries from forceful blows to the head. Some bruising was visible on the surface of the child's skin, but the true extent of the bruising and the amount of hemorrhaging beneath the scalp and beneath the skull were not apparent until revealed by the autopsy. Thus, the photographs of the child's skull with the scalp pulled back, State's Exhibits 35-37, and the photograph of the brain with the skull cut away, State's Exhibit 38, depict the nature of the injuries suffered and were relevant to the pathologist's testimony.

State's Exhibit 39 depicts the base of the skull after the child's brain had been removed. With regard to this photograph, the pathologist testified: "This is a view of the base of Dylan's skull after the brain has been removed. This is the small hole at the base of the skull that I described earlier." His earlier discussion of the small hole, the foramen, included an explanation of its significance with respect to brain death:

"Q. When you observed the brain of Dylan Cox, did you make any findings that were remarkable concerning the condition that you found this child in on the date of the autopsy?

"A. Yes, the brain was markedly swollen. It was, the word we use is edematous. It means that the brain itself was larger than its normal size.

"Q. Did you make any other remarkable findings with regard to the interior of the brain?

"A. The large size of the brain had forced the lower portion of the brain to extend downward into the neck. The skull, you will understand, is a fixed space. It's a bony ball, in a sense, which has a fixed volume. There is only one hole which is at the base of the skull which allows movement of the brain outward and when the brain swells significantly, the lower portion of the brain must go somewhere and in this case, the lower portion of the brain went downward into the upper portion of the neck.

"Q. The area that you just pointed to, does that have a particular name that would be familiar to most people?

"A. This area is called the cerebellum, which is a portion of the lower brain. Another area here is called the pons and the medulla. They are portions of the base of the brain that connect the brain with the spinal cord.

"Q. The area of the brain stem, where is that located?

"A. In this area which I'm identifying with the tip of my finger.

"Q. And in that particular area, what functions of the human body do those areas of the brain perform?

"A. Typically, that portion of the brain performs some vegetative functions. Vegetative means things we do as living organisms without thinking about it, such as breathing, for example.

"Q. When you have this swelling in the brain and where it has no location to go other than down toward the spinal cord, does that affect the way the body is maintained for these types of activities, such as respiration?

"A. Yes.

"Q. And what is [sic] the consequences of significant injury to that area?

"A. Significant injury and swelling causes compression and loss of blood supply to that area and that is followed by death of important nerve cells in that area. When those nerve cells die, they can no longer perform their vegetative function such as the function that stimulates us to breathe.

"Q. Is that what you would then call brain death?

"A. Yes."

Altum complains that this photograph is "particularly grotesque" and served only "to give the jury an anatomy lesson." Although State's Exhibit 39 does not depict an injury, it certainly was relevant to the pathologist's testimony about the cause of death.

Altum also contends that the photographs were unduly repetitious. All five autopsy photographs show the child's head, but there are three distinctly different depictions. State's Exhibits 35-37 show the skull, Exhibit 38 shows the brain, and Exhibit 39 shows the brain pan. Although Exhibits 35-37 all depict the child's skull, each shows a different area of bleeding. Exhibit 35 is of one side of the head, Exhibit 36 of the other, and Exhibit 37 of the top. Because there is probative value in each view, there is no undue repetition. See *State v. Clark*, 261 Kan. 460, Syl. ¶ 11, 931 P.2d 664 (1997).

It is well settled that the admissibility of photographs in a homicide case is a matter within the district court's discretion. *State v. Harris*, 259 Kan. 689, Syl. ¶ 10, 915 P.2d 758 (1996). In the circumstances of the present case, the district court was well within its discretion in admitting the autopsy photographs.

Affirmed.