No. 91,861

STATE OF KANSAS, *Appellee*, v. NEIL E. EDGAR, *Appellant*.

(127 P.3d 1016)

48

Opinion filed February 10, 2006.

*Stephen B. Chapman*, of Chapman & White, LLC, of Olathe, argued the cause and was on the brief for appellant.

*Paul J. Morrison*, district attorney, argued the cause, and *Steven J. Obermeier*, assistant district attorney, and *Phill Kline*, attorney general, were with him on the brief for appellee.

The opinion was delivered by

LUCKERT, J.: Neil E. Edgar (Edgar) was convicted of first-degree felony murder in the death of his adopted son, Brian Edgar, and two counts of abuse of a child with regard to two of his other adopted children, Martez and Christina Edgar. Edgar appeals his convictions, arguing: (1) The trial court erred in giving an aiding and abetting instruction; (2) the trial court's failure to give lesser included offense instructions deprived him of the ability to present his theory of defense; (3) his right to a fair trial was denied because of prosecutorial misconduct related to the issue of intent; (4) his right to a fair trial was denied because of other instances of prosecutorial misconduct; and (5) there was insufficient evidence to support his conviction of felony murder.

## FACTS

At about 5:30 a.m. on December 30, 2002, Edgar brought his son, Brian, to the emergency room at KU Medical Center saying that his son was not breathing. Attempts to resuscitate Brian were unsuccessful because rigor mortis had already set in, indicating Brian had been dead for several hours. Medical staff noticed that Brian had what appeared to be white tape residue on his face and the back of his head, bruises on his face, and suspicious injuries and scarring on his wrists and ankles.

When a doctor told Edgar that Brian was dead, Edgar began crying and said, "Oh Jesus, oh God, what have I done?" Edgar explained to the doctor, and later to police, that Brian had been waking up during the night and stealing food, so Edgar gave him a melatonin pill to help him sleep. Edgar was afraid the pill might have caused Brian to stop breathing. Edgar said that he had checked on Brian several times during the night and heard him snoring. The last time he checked, Brian was not responsive and Edgar brought him to the hospital. One of the first things Edgar said to police was, "It was an accident."

Edgar provided police an address in Kansas City, Kansas, which he said was the family home. With Edgar's consent, police conducted a search of the residence and found socks with a piece of duct tape attached. When police informed Edgar of what they had found, Edgar admitted he had restrained Brian the night before to

keep him from getting out of bed and getting into things. He said he used two belts, one around Brian's arms and torso and another around his ankles, put a sock in Brian's mouth to keep him from "hollering," and put a small piece of duct tape over Brian's mouth. Police were doubtful of Edgar's story because they knew Brian's entire head had been taped, not just his mouth.

Early in the investigation, police also learned that Brian had three siblings who had been in the home at the time of his death— Christon, Martez, and Christina. Edgar and his wife, Christy Edgar, adopted Christon, Martez, and Christina, who were biological siblings, in 1997. They adopted Brian a year or two later. At the time of the hearing, Christon was 16 years old, Martez was 12, and Christina was 9. Brian was 9 years old when he died. Police also discovered that Chasity Boyd had spent the night at the house the night Brian died. Boyd was described by the Edgars as a "granddaughter," who often stayed with the Edgars and babysat the children.

Edgar told police that the family could be found at the church where he was pastor and his wife was copastor, evangelist, and prophet. The police took the Edgar children to Sunflower House, a child advocacy center, for forensic interviews. Initially, both Christina and Martez were reluctant to disclose any information because they were afraid of being taken away from their parents. Later that day, the children began to talk to detectives about incidents of abuse.

Christina told detectives that she and her brothers had been frequently bound or tied up with socks, duct tape, and plastic ties and a stocking had been tied around her eyes and mouth, although she was still able to breathe. She said that Boyd had tied up the children at the direction of Christy. Although Christina had never seen Neil Edgar tie up any of the children, he had threatened to do so.

Martez told detectives that he had been tied up once for stealing water from a faucet without asking permission. He said that Brian got into trouble and was tied up more often; sometimes Brian was tied to his bed. According to Martez, his father normally disciplined the boys and his mother normally disciplined his sister, although

the boys previously had been tied up by both their father and mother. Martez said his father had tied up Brian on the night of his death.

When police talked to Edgar again the next day, he said, "I did it. If my kids say I've done it, I did it," and, "Leave the church out." The police did not believe Edgar was being truthful and thought he would admit to anything they said.

Two days after Brian's death, police received a phone call from a man who had installed an alarm system for the Edgars and who told police that the Edgars lived in Overland Park, Kansas. The police verified that the family had been living at the Overland Park house, which is in Johnson County, and it was that house where Brian died. Police executed search warrants at the Johnson County house and at the Edgars' church. The house appeared to have been recently cleaned and all the trash taken out. This was consistent with the children's report that they had gathered Brian's pajamas, pieces of duct tape, and other evidence and taken it to a church member's house where it was burned in the fireplace. Some duct tape and plastic ties were found in the garage. At the church, officers found more duct tape, handcuffs, Neosporin, and a fan belt with a loop tied in one end which could have been used as a weapon.

As a result of the investigation, Edgar, Christy, and Boyd were charged under separate complaints with the same crimes. Count I of the complaint against Edgar charged felony murder, in violation of K.S.A. 21-3401, occurring during the commission of abuse of a child by inflicting cruel and inhuman corporal punishment upon Brian Edgar. Counts II and III charged him with child abuse, in violation of K.S.A. 21-3609, arising from inflicting cruel and inhuman corporal punishment upon Martez and Christina Edgar, respectively, during the time period from May 9, 2002, to December 30, 2002.

The trial court consolidated the three cases for trial. Before opening statements, Christy Edgar pled guilty to all of the charges. After consent from the codefendants' attorneys, the jury was informed of Christy's plea and the trial against Edgar and Boyd continued.

At the trial, evidence regarding the victim's autopsy was introduced which revealed that Brian had died of asphyxiation when he aspirated his own vomit while a foreign object was blocking his mouth. The medical examiner also opined that the injuries and scarring on Brian's wrists and ankles were consistent with ligature marks and were of different ages, from a few weeks to more than a year old.

In other evidence presented at trial, detectives recounted the initial admissions by Edgar and those portions of the statements by Christina and Martez which were not recorded. Jurors were then shown the videotaped interviews.

The Edgars' oldest child, Christon, explained what happened to Brian during the weekend of his death. On Saturday night, the night before Brian died, Christy and Boyd taped Brian as punishment for stealing food. Brian was taped from his feet to his shoulders "like a mummy" with duct tape, and he was gagged with a sock to keep him from gnawing through the tape. Brian had been nicknamed "Houdini" because he was adept at escaping from various bindings.

Christon testified that Sunday night, Brian was in trouble again, this time for stealing food at church. When Christon and his father got home that evening, Christy, Boyd, and Brian were already there. Christon and his father watched television while Boyd and Christy taped up Brian. When they had wrapped him from his feet to his waist, they ran out of duct tape. According to Christon, his father told his mother he would take her to the store. When they returned with the tape, Edgar went to his bedroom and the women finished taping Brian. Christon described the women putting a sock in Brian's mouth and wrapping the tape around his head, covering his mouth. Christon remembered one of the women telling Brian, "Now try to get out of this one." Brian was then placed in an small room under the basement stairs and left for the night on a sleeping bag placed on the concrete floor. Christon told the jury that Edgar knew about the taping on both nights, although on the night Brian died Edgar only saw Brian taped to the waist.

Martez and Christina testified via closed-circuit television after the trial court found they would be extremely traumatized by tes-

tifying in the presence of their parents. Martez testified that he had been tied up twice by Boyd. Once was on the night Brian died when Martez made his father mad by talking too much. Although Edgar did not tell her to, Boyd tied Martez' hands in front of him with socks placed over his arms first to keep the plastic ties from scarring him. Christon had also testified that he woke up to see bindings around the bunk bed where Martez slept that night. Martez testified that he had seen Brian tied up before, sometimes with "twisty-ties." According to him, his mother would tell Boyd to get the ties and Boyd would then tie up Brian.

Christina testified that Boyd had taped her or used plastic ties to restrain her. She had also had a stocking or tape put over her mouth. On the night Brian died, Christina said all three of the youngest children had been in trouble. Christina was tied up and slept on the floor in a room in the basement.

Both Martez and Christina had scars on their wrists consistent with ligature marks. Christina also had scars on the back of one leg and one shoulder consistent with having been hit with a looped cord.

Edgar testified in his own defense. He told the jury he had been married to Christy for 31 years and she had handled the adoption of the children. He also stated that his wife and "the womens [sic] of the church" handled the discipline. According to Edgar, on the night Brian died he took his wife to the store but never knew what she bought there. He admitted to seeing Brian's hands and legs taped and to knowing that was done to keep him from getting up. However, he explained that he did not think Brian would be harmed by it. Edgar said that his wife woke him in the early morning hours and told him Brian was not breathing. He told the jury that he lied to the doctor because he knew Christy and Boyd had done something wrong.

On cross-examination, Edgar admitted that he "knew of some restriction" of the children. He said that he did not stop it because "the womens [sic] was in charge of it and my wife, that was their job and I trusted them."

Chauntel Williams, a member of the Edgars' church, testified that Christy said God had told her about a new way of disciplining

the children by tying them up. Williams told the jury she had seen Brian, Martez, and Christina tied up by their hands and feet with plastic ties.

The jury convicted both Edgar and Boyd of first-degree felony murder and two counts of abuse of a child. The trial court sentenced Edgar to a controlling term of life for the felony murder of Brian Edgar and to 32 months' imprisonment on each of the child abuse convictions, with those sentences to run concurrent with each other and consecutive to the sentence for felony murder.

## I. AIDING AND ABETTING INSTRUCTION

Edgar contends that the trial court erred in instructing the jury on aiding and abetting. At trial, Edgar objected to the general aiding and abetting instruction on the basis that there was no evidence that he aided or abetted in taping Brian on the night Brian died and no evidence that he knew Brian had ever been taped or restrained above the arms. He also objected to the inclusion of aiding and abetting language in Instruction Nos. 13, 14, 15, and 16. Those instructions contained the elements of the crimes charged and provided that Edgar could be convicted if the jury found that Edgar committed child abuse or intentionally aided and abetted another to commit the child abuse. He contends that referring to aiding and abetting in these instructions made him "presumptively guilty" of the actions of Christy and Boyd.

When an objection to instructions has been lodged, our standard of review requires this court to consider the instructions as a whole and not isolate any one instruction. " ' "If the instructions properly and fairly state the law as applied to the facts of the case, and a jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous. [Citations omitted]." ' " *State v. Mays,* 277 Kan. 359, 378-79, 85 P.3d 1208 (2004).

The trial court instructed the jury consistent with PIK Crim. 3d 54.05:

"A person who, either before or during its commission, intentionally aids or abets another to commit a crime with intent to promote or assist in its commission

is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime."

Edgar's objection to this instruction is that there was not an evidentiary basis for giving the instruction. An instruction on aiding and abetting is appropriate if the jury could reasonably conclude from the totality of the evidence that the defendant aided and abetted another in the commission of a crime. *State v. Pennington*, 254 Kan. 757, 764-65, 869 P.2d 624 (1994).

In *State v. Smolin*, 221 Kan. 149, 557 P.2d 1241 (1976), the court discussed the concept of aiding and abetting within the context of child abuse. A mother was convicted of aiding and abetting in the aggravated battery of her daughter after the child was apparently abused by a caretaker. This court quoted with approval an Indiana case discussing aiding and abetting:

" 'While it is true that the mere presence of a person at the scene of a crime is insufficient to constitute him a principal therein, in the absence of anything in his conduct showing a design to encourage, incite, aid, abet or assist in the crime, the trier of the facts may consider failure of such person to oppose the commission of the crime in connection with other circumstances and conclude therefrom that he assented to the commission of the crime, lent his countenance and approval thereto and thereby aided and abetted it. [Citations omitted.] *This, it seems to us, is particularly true when the person who fails to interfere owes a duty to protect as a parent owes to a child.* [Citation omitted.]' " (Emphasis added.) 221 Kan. at 153 (quoting *Mobley v. State*, 227 Ind. 335, 343-44, 85 N.E.2d 489 [1949]).

The *Smolin* court held that where the mother was aware of her child's injuries and did nothing to discover their cause or prevent their reoccurrence, there was sufficient evidence to instruct the jury on aiding and abetting. 221 Kan. at 153.

Similarly, the evidence clearly supported the giving of an aiding and abetting instruction in this case. Edgar admitted that he saw Brian bound by his hands and legs on the night he died. This was consistent with the testimony of Christon, who stated that his father was present when Brian was being taped on the night he died and then left to take his mother to get more tape. Additionally, detectives testified that Christina told them that her father had threatened to tie up the children. The detectives also testified that Martez reported to them that his father had tied up Brian with socks

on the night Brian died and that his father had previously participated in tying up Brian. (Neither Christina nor Martez repeated these statements in their trial testimony.). Edgar also admitted in his testimony that he "knew of some restriction" of the children but did not stop it because the women were in charge of discipline.

Finally, Edgar's statements to police were also probative. Detectives testified that Edgar described binding Brian with belts and placing a sock in his mouth with a small piece of tape over it. The fact that Edgar made up the kind of story that he did—one involving the restraint of Brian so that he would not get into things and the placing of a sock into and tape over his mouth so that he would not "holler"—supports an inference that Edgar knew these activities were taking place even if it was actually Christy and Boyd who were performing them, as he later alleged. Considering this evidence, the trial court did not err in giving an aiding and abetting instruction in this case.

Furthermore, when the instructions are read as a whole, the jury could not have been misled to believe there was a presumption of guilt because of the inclusion of aiding and abetting language in Instruction Nos. 13, 14, 15, and 16. The jury had to find beyond a reasonable doubt that Edgar had in some way aided and abetted the child abuse. The instructions that included aiding and abetting language were not erroneous.

## II. LESSER INCLUDED OFFENSES

Edgar also argues that the trial court deprived him of his theory of defense by refusing to instruct the jury on lesser included offenses. At the instructions conference, Edgar requested that the trial court instruct the jury on endangering a child, K.S.A. 21-3608, and criminal restraint, K.S.A. 21-3424, as lesser included offenses of all three counts (count I charging felony murder and counts II and III charging abuse of a child). In support of this request, defense counsel argued that Edgar's theory of defense was that Edgar "participated in endangering a child and criminal restraint." Edgar also joined in codefendant Boyd's request for lesser included offense instructions on unintentional second-degree murder and involuntary manslaughter. Defense counsel stated he wanted to be

able to argue to the jury that Edgar did not know, but should have known, that his actions could result in Brian's death.

The trial court refused to give any lesser included offense instructions, finding that endangering a child and criminal restraint were not lesser included offenses of child abuse based on the elements of those offenses and the evidence of the underlying felony of child abuse was not weak or inconclusive.

Edgar has shifted the focus of his argument on appeal. He is no longer arguing that the trial court should have instructed the jury on lesser included offenses of the two counts of abuse of a child involving Martez and Christina. (This is consistent with trial counsel's strategy of conceding counts II and III during closing argument. Counsel stated, "[I] really don't care about Counts II and III. Something went on. And if you want to find my client guilty of Counts II and III, go right ahead. I'm not going to argue that."). Now, Edgar contends that the trial court erred in failing to instruct on unintentional second-degree murder and involuntary manslaughter as lesser included offenses of felony murder based on an underlying misdemeanor of endangering a child. In other words, Edgar contends the jury could have found his conduct toward Brian constituted endangering a child rather than abuse of a child; therefore, the jury could have reasonably convicted him of involuntary manslaughter based on the underlying misdemeanor of endangering a child. Edgar does not explain what evidence would have supported a conviction of unintentional second-degree murder.

In a felony-murder case, the trial court is required to instruct on lesser included offenses only when the evidence of the underlying felony is weak, inconclusive, or conflicting. *State v. Boone*, 277 Kan. 208, Syl. ¶ 6, 83 P.3d 195 (2004). This is because "[a] defendant's commission of the underlying felony supplies elements which must be absent from the lesser degrees of homicide, and a jury should be instructed only on lesser offenses of which the defendant reasonably may be convicted." *State v. Altum*, 262 Kan. 733, 738, 941 P.2d 1348 (1997). This court has previously decided cases addressing whether lesser included offense instructions were required when the defendant was charged with felony murder

based on the underlying felony of child abuse and in those cases has applied the test of whether the evidence of the underlying felony is weak, inconclusive, or conflicting. See, *e.g.*, *State v. Struzik*, 269 Kan. 95, 113, 5 P.3d 502 (2000); *State v. Heath*, 264 Kan. 557, 572-73, 957 P.2d 449 (1998); *State v. Altum*, 262 Kan. at 738-39; *State v. Hupp*, 248 Kan. 644, 652-53, 809 P.2d 1207 (1991).

In this case, Edgar contends: (a) the evidence was weak, inconclusive, and conflicting as to all the defendants because no one had the intent to injure or kill Brian and (b) even if the evidence supporting the underlying felony of child abuse may have been strong as to Christy and Boyd, it was weak, inconclusive, and conflicting as to him because (i) there is a question as to who committed the crime and (ii) there is only circumstantial evidence that he aided and abetted the child abuse.

## A. *Intent*

Edgar's argument that the evidence was not strong because no one had the intent to injure or kill Brian has no merit. The argument ignores the theory of felony murder, which is that when a homicide occurs during the commission of a felony, the " 'felony is the statutory equivalent to the deliberation and premeditation essential to murder in the first degree.' " *Altum*, 262 Kan. at 738 (quoting *State v. Masqua*, 210 Kan. 419, 425, 502 P.2d 728 [1972], *cert. denied* 411 U.S. 951 [1973]). The only intent required for the offense of child abuse is the intent to commit the act of torturing, beating, shaking, or inflicting cruel and inhuman corporal punishment on a child; there is no requirement of an intent to injure. See *Heath*, 264 Kan. at 572; *Hupp*, 248 Kan. at 653. So long as Edgar intentionally aided and abetted the taping of Brian, which constituted the abuse, it does not matter whether he intended to injure Brian.

It was also irrelevant whether Edgar knew Brian might die. As previously discussed, intent to commit a murder is not an issue in felony murder. See *Struzik*, 269 Kan. at 113. Furthermore, where the underlying felony is an inherently dangerous felony, the State need not prove that the victim's death was foreseeable. *State v. Gleason*, 277 Kan. 624, 638, 88 P.3d 218 (2004) (where underlying

felony is one inherently dangerous to human life, foreseeability requirement is established as a matter of law). Child abuse is an inherently dangerous felony. See K.S.A. 2004 Supp. 21-3436(a)(7).

Thus, there is no merit to Edgar's argument that the evidence is weak because there is no proof of an intent to injure or kill.

### B. Strength of Evidence That Felony Was Committed Versus Strength of Evidence as to Who Committed the Felony

Edgar also argues that even if the evidence is considered strong as to Christy and Boyd, it is weak as to him because there was conflicting evidence as to who committed the underlying felony of child abuse. The State responds that the decision to instruct on lesser included offenses does not vary with each codefendant. In other words, according to the State, if the evidence that the underlying felony was committed was strong (and the State argues that it was), it does not matter whether the evidence was equally strong as to each particular codefendant.

Neither party cites any authority to support its position. However, codefendant Boyd raised this same issue in her appeal and cited to *Altum*, 262 Kan. 733, as support for the argument posited by her and Edgar. In the decision on her appeal, *State v. Boyd*, (No. 91,980, this day decided), we discussed *Altum* and *State v. Rayton*, 268 Kan. 711, 723, 1 P.3d 854 (2000), concluding:

"[T]he rule that a trial court is required to instruct on lesser included offenses of felony murder only when the evidence of the underlying felony is weak, inconclusive, or conflicting does not pertain to evidence about who committed the underlying felony. The rule pertains to evidence that the underlying felony was committed." *Boyd*, slip. op. at 30.

### C. Evidence of Aiding and Abetting

Edgar argues the evidence of him aiding and abetting the child abuse of Brian is circumstantial and weak. In support of his argument he cites *State v. Hupp*, 248 Kan. 644. He suggests that although *Hupp* is distinguishable on its facts (explaining why the holding is the opposite of that sought by Edgar), the court's reasoning when applied in this case requires the giving of the lesser included instructions. In *Hupp*, the defendant unsuccessfully sought instructions on involuntary manslaughter as a lesser in-

cluded offense of felony murder based on child abuse. On appeal, this court applied the following test:

"The analysis of whether the jury should have been instructed on lesser included offenses includes two steps. The first step in analyzing this issue is to determine whether the evidence of child abuse was so strong that no instruction on lesser included offenses was necessary. If the evidence of the underlying felony was strong, no instruction on the lesser included offenses need have been given. Then, if the evidence was not strong, this court would consider whether there was evidence on which a jury could have found the defendant guilty of the lesser included offenses. If there was not, no instruction on lesser included offenses need have been given." 248 Kan. at 652.

See *Boone*, 277 Kan. at 221; *State v. Douglas*, 274 Kan. 96, 103, 49 P.3d 446 (2002), *cert. denied* 537 U.S. 1198 (2003); *State v. Branning*, 271 Kan. 877, 887, 26 P.3d 673 (2001); *State v. Davis*, 247 Kan. 566, 573, 802 P.2d 541 (1990).

In discussing whether the evidence of the underlying felony was strong, the *Hupp* court noted that the evidence was circumstantial and presented the jury with two possible choices: either Hupp intentionally hit the child, crushing the child's skull, or the child was accidentally injured. If Hupp intentionally hit the child, his conduct constituted child abuse because "[a] blow that crushes an infant's skull and kills the child is, as a matter of law, a 'cruel beating.' " 248 Kan. at 653. Because the evidence showed that Hupp either cruelly beat the child or did not hit the child at all, the court ruled no instruction on the potential lesser included offense of involuntary manslaughter based on an underlying misdemeanor battery was required. 248 Kan. at 653-54. In other words, instead of deciding whether the evidence of the underlying felony was strong, the court concluded that there was no evidence to support the giving of the requested lesser included instruction.

Although the lesser included offense instruction analysis was not explicitly stated, in order to reconcile the *Hupp* holding with the stated test, it appears that the court implicitly concluded that the first step was not satisfied. The court must have believed that the evidence was not strong, so it then moved on to the second step to consider whether there was evidence on which the jury could have found the defendant guilty on a lesser included offense. (On

occasion, this court has ruled that "even if we were to conclude" the evidence of felony murder was weak, there was not evidence upon which a jury could have convicted the defendant; in other words, there was no "real possibility the jury would have returned a different verdict." *State v. Calvin*, 279 Kan. 193, 201-02, 105 P.3d 710 (2005). This has caused confusion, as we acknowledged in *State v. Torres*, 280 Kan. 309, 326, 121 P.3d 429 [2005]).

Edgar argues that, like *Hupp*, the evidence of the underlying felony is not strong, and, unlike *Hupp*, there is evidence to support the giving of the requested lesser included instructions. According to Edgar, the State's theory was that he knew about the taping and did nothing to stop it, but the State presented no evidence that he knew that Brian's head was taped or that his airway could be affected. Edgar contends these facts would have supported a finding of endangering a child (and, presumably, a conviction of involuntary manslaughter based on an underlying misdemeanor).

We disagree and find that, unlike *Hupp*, in this case there is no need to move past the first step of the analysis because the evidence of the underlying felony was strong. Edgar's argument to the contrary fails to account for the nature of an aider and abettor's culpability. A defendant may be convicted of felony murder if he or she aids and abets the underlying felony, and the defendant need not even be physically present when the crime is committed. *Gleason*, 277 Kan. at 635. Prosecution under an aiding and abetting theory does not make the evidence of the underlying felony weak, conflicting, or inconclusive.

### D. Conclusion Regarding Lesser Included Instructions on Felony Murder Count

The evidence of child abuse in this case was strong and conclusive. There was overwhelming evidence that Brian was bound with duct tape like a mummy, his mouth blocked with a foreign object, and there were ligature marks on his wrists and ankles. These facts were strong evidence of cruel and inhuman corporal punishment constituting child abuse under K.S.A. 21-3609. There was also strong evidence that Edgar aided and abetted these acts. The jury either believed that Edgar aided and abetted the child abuse, in

which case he was guilty of felony murder, or it believed that he had not aided and abetted the abuse, in which case he would have been found not guilty. The trial court did not err in refusing to give lesser included instructions for felony murder.

Furthermore, Edgar was not deprived of his constitutional right to present his theory of defense. The right under the federal and state constitutions to present a defense is subject to statutory rules and case law interpretations of the rules of evidence and procedure. *State v. Lackey,* 280 Kan. 190, 216, 120 P.3d 332 (2005). Under the applicable rules, Edgar was not entitled to the requested instructions.

### III. PROSECUTORIAL MISCONDUCT IN CLOSING ARGUMENT

Edgar argues that prosecutorial misconduct denied him a fair trial. Specifically, he complains that the prosecutor misstated the law by telling the jury that it did not need to find that he intended to abuse Brian in order to convict him of felony murder.

This court stated the standard for reviewing claims of prosecutorial misconduct in *State v. Tosh,* 278 Kan. 83, 85, 91 P.3d 1204 (2004):

"A two-step analysis is applied to allegations of prosecutorial misconduct. First, the court decides whether the prosecutor's comments were outside the wide latitude allowed in discussing the evidence. Second, the court must decide whether the comments constitute plain error; that is, whether the statements are so gross and flagrant as to prejudice the jury against the defendant and deny him or her a fair trial, thereby requiring reversal. The facts of each case must be scrutinized in determining whether a prosecutor's remarks deny the defendant a fair trial. If the prosecutor's statements rise to the level of violating a defendant's right to a fair trial and deny a defendant his or her Fourteenth Amendment right to due process, reversible error occurs without regard to a contemporaneous objection. [Citation omitted.]"

During the rebuttal portion of closing argument, the prosecutor stated:

"Well, one of the things I'm going to make a real effort not to do is to say that we have to prove that these defendants intentionally tried to kill Brian Edgar because we know that's not what the law tells us, that's not what the instructions tell us. I did count how many times Mr. Kuchar [counsel for Chasity Boyd] and Mr. Cornwell [counsel for Neil Edgar] said, Did he intend to kill them? *Did he intend to abuse them? Look at the instructions, that doesn't have to be proven.*

And whether Mr. Cornwell and I want to argue and split hairs about policy doctrines and whatnot, the law says if you commit an inherently dangerous felony and somebody dies, then you are guilty of a murder." (Emphasis added.)

The prosecutor's initial description of the felony-murder rule and his later statement that intent to kill need not be proved were accurate statements of the law. See *State v. Young*, 277 Kan. 588, 594, 87 P.3d 308 (2004) ("The felonious conduct proved in a felony-murder prosecution stands in for the deliberation and intent ordinarily required to be proved in a premeditated murder case."); *Struzik*, 269 Kan. at 113 ("Intent is not an issue in felony murder."). However, the prosecutor went one step further and also stated that he did not have to prove that the defendants intended to abuse Brian. This was a misstatement of the law. The State was required to prove that the defendants intentionally committed the underlying felony of child abuse.

Because the prosecutor's statement was improper, the first part of the *Tosh* test has been met and we must next consider whether the statement constituted harmless or prejudicial error. In determining whether prosecutorial misconduct warrants reversal, an appellate court considers three factors:

"(1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. None of these three factors is individually controlling. Before the third factor can ever override the first two factors, an appellate court must be able to say that the harmlessness tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824, (1967), have been met." *Tosh*, 278 Kan. 83, Syl. ¶ 2.

Applying the first and second factors, the prosecutor's statement was not gross and flagrant, nor does it show ill will. There is no indication that the prosecutor purposefully misstated the law. Rather, it appears that the prosecutor was trying to counter the arguments of defense counsel for both Edgar and Boyd that their clients did not intend to kill Brian by accurately pointing out that, under the felony-murder rule, such intent was not required. Much of the closing arguments focused on the issue of intent. The pros-

ecutor initially described the felony-murder rule to the jury as follows:

"[T]he felony-murder rule . . . is the Public Policy Doctrine where the Legislature has said . . . if you're going to engage in an inherently dangerous felony, you better hope nobody dies because if you're going to engage in that kind of conduct and somebody dies, we're going to call it murder. We're going to call it murder even if it was an accident. We're going to call it murder even if you're not the one that did it; even if you didn't want anybody to get hurt. And I think we would all agree that's a good rule. That's the way it should be. And the Legislature has determined that child abuse—as I hope we'd all agree—is an inherently dangerous felony because sometimes, not always, thank God, but sometimes kids die."

Edgar's counsel then argued that no witness had testified about the public policy behind the felony-murder rule, stating:

"Has anybody come forward and said, it's the Legislature's intent such that if you participate in a crime like this and a homicide occurs then you are guilty of felony murder? No. That's [the prosecutor's] interpretation of what he thinks felony murder is. You can't consider that as public policy. You can't consider that this case is what the Legislature meant this to be because it is not evidence because somebody from the Legislature didn't get up there and raise their right hand to God and swear to tell the truth."

Defense counsel also argued:

"Did [Neil] intentionally aid and abet? Did he intentionally participate in the acts that caused the death of Brian Edgar? And the answer is no.

"Look at Instruction No. Eight. Read what the Judge tells you intentionally means. Instruction No. 8 says intent means conduct that is purposeful and willful and not accidental. Did my client intend this? Did my client want this little boy to die?"

In reviewing the instruction on the elements of child abuse as the underlying felony for felony murder, defense counsel again asked the jury to look at the definition of "intentional" contained in Instruction No. 8:

"You think back. Find one scintilla of evidence that my client intended that poor child's head to be wrapped with duct tape. Find one witness that said that he knew that was going on. There is none. Did he intend for this to happen? The instruction says you have to find that it was intentional. And if you don't, then the prosecution hasn't proven its case to you beyond a reasonable doubt."

Boyd's defense counsel also focused on intent during closing argument:

"I'm going to ask you to use your common sense. And then while considering all this evidence, all these versions; as human beings, do you think my client intended on killing a 9-year-old boy? Do you think she intended in her mind to inflict corporal and inhumane cruelty upon that 9-year-old boy?

. . . .

"And when you look at your instructions and when you ask yourselves, did Chasity Boyd intend on abusing these kids? Did she intend on inflicting cruel and inhuman corporal punishment on these kids? Did she intend on Brian Edgar dying? The answer to all of those questions are no."

At this point, the prosecutor began his rebuttal with the statement about which Edgar now complains. In the context of these arguments, the statement was not flagrant. Also, the prosecutor made the statement only once; it was not repeated.

It is appropriate to consider the misstatement in the context of the jury instructions given by the trial court. *State v. Hurt*, 278 Kan. 676, 685, 101 P.3d 1249 (2004). In this case, as he made the misstatement, the prosecutor actually referred the jury to the instructions, saying, "Look at the instructions." Those instructions accurately set out that the State was required to prove that Edgar "intentionally inflicted cruel and inhuman bodily punishment upon Brian Edgar" or that he "intentionally aided and abetted another to inflict cruel and inhuman bodily punishment upon Brian Edgar" and that Brian was killed during the commission of that act in order to establish the felony-murder charge.

Under the third factor of the *Tosh* test for determining if the misconduct warrants reversal, we must consider whether the evidence against the defendant was of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. In this case, as previously discussed, there was overwhelming and direct evidence of child abuse. The only question was whether Edgar aided and abetted in its commission. Given Edgar's duty as a parent to protect his child, his admission that he saw Brian taped by the hands and legs on the night he died, the circumstantial evidence that he knew Brian was gagged, and his admission that he "knew of some restriction" of the children but did not stop it even though, according to the evidence, this type of punishment had been used for a significant period of time and repeatedly, there was also direct and overwhelming evidence that

Edgar aided and abetted the abuse of Brian. Under these circumstances, any error in the prosecutor's closing argument was harmless beyond a reasonable doubt.

### IV. OTHER INSTANCES OF PROSECUTORIAL MISCONDUCT

Edgar also contends that the prosecutor committed misconduct during closing argument and cross-examination of Edgar by improperly referring to Edgar's failure to protect his children from harm. According to Edgar, the prosecutor attempted to paint him as an inattentive or uninvolved father and asked the jury to consider his failure to intervene to protect Brian as evidence of guilt. Edgar contends this argument improperly shifted the burden of proof and appealed to the passions of the jury.

Edgar complains of the following statement by the prosecutor during closing argument:

"Mr. Cornwell [counsel for Neil Edgar] asked Chauntel Williams. He said, just like if you were walking with your kid and a rabid dog or mean dog came, you'd step between them. You know what, he's exactly right because that's what you do for your kid, isn't it? Because we know parents have a duty to protect their kids, you have a higher responsibility to protect your kids that involves everything completely at the other end of the spectrum from what we saw these folks do."

The prosecutor's "rabid dog" comment was a reference to defense counsel's questioning of Williams about the meaning of the word "protect." Defense counsel had stated: "Protect means you were trying to prevent something from happening to them. In other words, you're walking your children and vicious dog comes out. You put the children behind you to protect them from the dog. Do you understand?" Given this context, we conclude the prosecutor's statement was within the wide latitude allowed in discussing evidence.

Edgar's remaining complaints relate to questions asked by the prosecutor. We acknowledge we have applied the *Tosh* standard regardless of whether the alleged misconduct occurs during witness examination or closing argument. *State v. Swinney*, 280 Kan. 768, 779, 127 P.3d 261 (2006); see *State v. Dixon*, 279 Kan. 563, 590-92, 112 P.3d 883 (2005) (in context of cross-examination, first step is to decide whether the complained-of conduct was outside

the considerable latitude given a prosecutor in eliciting testimony and commenting on it); *State v. Overton*, 279 Kan. 547, 558-60, 112 P.3d 244 (2005) (in context of cross-examination, first step is to decide if the prosecutor's questions were relevant and supported by a good faith basis for believing the asserted matter to be true); *Tosh*, 278 Kan. at 87-89 (cross-examination), 89-93 (closing arguments). Thus, we must first determine whether asking these questions constituted misconduct.

Edgar contends that the prosecutor used irrelevant evidence consisting of Kansas Department of Social and Rehabilitation Services (SRS) policies on discipline in attempting to disparage Edgar's parenting skills. These questions were relevant to Edgar's intent to commit corporal punishment which was cruel and inhuman; the policies defined appropriate punishment. Therefore, there was no misconduct.

Additionally, Edgar complains of other questions asked by the prosecutor in a particularly sarcastic and contemptuous manner. Some examples which Edgar cites are the prosecutor questioning: whether the reason Edgar did not know Martez was bound was "[j]ust because you're that uninvolved with your kids"; "Why did you have the kids in the house if you don't even bother to know how old they are?"; "Did you even read [the forms] before they are turned into SRS?"; "Did you try to find out about those kids?"; "You didn't even know how old [Brian] was?"; "You didn't even bother to find out his birthday?"; "Skill No. three, on worksheet four, describe the strength about knowing your children and abusive background; and you write, 'Our family works closely with abused children in our ministry.' . . . She didn't write down about abusing. She left that part out?"; and, "Mr. Edgar, your kids testified, you know your kids, Christina and Martez." Defense counsel objected about the sarcastic tone of many of these questions.

Defense counsel again objected to the prosecutor's tone during the following exchange:

"Q: [MR. MORRISON]: [Brian] was murdered, wasn't he?
"A: [EDGAR]: I don't know, sir, I believe it was an accident.
"Q: Okay. Just one of those pesky household accidents?

"MR. CORNWELL: Judge, this is cross-examination. It may very well be that.

"THE COURT: I understand what you're talking about.

"MR. CORNWELL: If I did that with one of the witnesses, you'd throw me out of here.

"MR. MORRISON: I don't think he would. He's taken the witness stand and testifying to certain things. I have a right to challenge it.

"THE COURT: I think you know what his objection is about.

"Q: (By MR. MORRISON) Accidents will happen. Is that how it works?

"A: I know accidents does happens."

Some of the prosecutor's questions of Edgar were sarcastic and argumentative. However, the prosecutor's comments were limited to the evidence presented at trial. See *State v. Burden*, 30 Kan. App. 2d 690, 702-03, 46 P.3d 570 (2002), *rev'd on other grounds* 275 Kan. 934, 69 P.3d 1120 (2003). Furthermore, there was nothing improper about cross-examining Edgar as to his role as a parent and his duty to intervene to stop the abuse. A parent does owe a duty to protect a child. See *State v. Wilson*, 267 Kan. 550, 566, 987 P.2d 1060 (1999) (discussing cases recognizing a legal duty of parent to protect a child); 59 Am. Jur. 2d, Parent and Child, § 22, p. 190 ("It is the right and duty of parents under the law of nature as well as the common law . . . to protect their children. . . . A parent's failure to act can violate the duty to protect a child from abuse."). As discussed earlier, a person who fails to oppose the commission of crime may be convicted as an aider and abettor if the circumstances show that the person assented or lent his or her countenance and approval to the commission of the crime, particularly where " 'the person who fails to interfere owes a duty to protect as a parent owes to a child. [Citation omitted.]' " *Smolin*, 221 Kan. at 153.

The prosecutor's questions were relevant and sought evidence regarding Edgar's neglect of Brian. While overly sarcastic and argumentative questioning is not condoned, we hold that there was no misconduct.

## V. SUFFICIENCY OF THE EVIDENCE

Finally, Edgar contends that the evidence was insufficient to support his conviction of felony murder of Brian. He does not

contest the evidence in support of his convictions of abusing Martez and Christina.

When a criminal defendant challenges the sufficiency of the evidence, this court's standard of review requires the court to review all of the evidence, viewed in the light most favorable to the prosecution, and determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Calvin*, 279 Kan. 193, 198, 105 P.3d 710 (2005).

As previously discussed, there was overwhelming evidence of child abuse in this case and of Edgar's involvement. There was some evidence through Martez' statements that Edgar was the one who taped Brian the night he died. The evidence is even stronger that Edgar aided and abetted the commission of the felony of child abuse. Christon testified that his father was present while Brian was being taped; Edgar admitted that he had seen Brian taped by the hands and legs; he also admitted he "knew of some restriction" of the children but did not stop it; and there was some evidence that he knew Brian's mouth had been taped or otherwise gagged.

A rational factfinder could have found Edgar guilty of felony murder based on the underlying felony of child abuse.

Affirmed.