IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 113,684

STATE OF KANSAS,
*Appellee*,

v.

TROY A. ROBINSON,
*Appellant.*

SYLLABUS BY THE COURT

1.

In order to be admissible, evidence must be relevant. Relevant evidence is evidence that is probative and material. In order to be material, evidence must tend to establish a fact that is at issue and is significant under the substantive law of the case.

2.

Under the Kansas statutory scheme, the crime of aggravated burglary requires the presence of a living human being in the location of the burglary.

3.

The purpose of voir dire is to enable the parties to select competent jurors who are without bias, prejudice, or partiality. The nature and scope of the voir dire examination is generally entrusted to the sound discretion of the trial court.

4.

In determining whether the trial court has taken sufficient measures to assure that the accused is tried by an impartial jury free from outside influences, appellate courts independently evaluate the circumstances.

1

5.

The punishment in death penalty cases has a unique nature and is qualitatively different from sentences of imprisonment, however long. Rules derived from capital cases therefore do not necessarily carry over into other felony trials.

6.

A defendant does not have an absolute constitutional right to make case-specific mitigation inquiries during voir dire.

7.

K.S.A. 2013 Supp. 21-6620(c)(1) allows the State to wait until after it obtains a conviction before it declares its intention to seek a mandatory minimum sentence of 50 years.

Appeal from Shawnee District Court; NANCY E. PARRISH, judge. Opinion filed May 26, 2017. Affirmed.

*Samuel D. Schirer*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Jodi Litfin*, assistant district attorney, argued the cause, and *Chadwick J. Taylor*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Troy Robinson appeals from his conviction by a jury of premeditated first-degree murder, aggravated burglary, and misdemeanor theft. He also appeals from

the jury's finding of factors supporting imposition of a hard 50 sentence. Finding no error, we affirm.

## FACTS

A sad sequence of events led to this appeal. In December 2012, Robinson was living with a friend, Adonis Johnson, in a trailer park in Topeka. Early in the afternoon of December 19, Robinson dropped in on Susan Pallaschke, his friend and neighbor. He used Pallaschke's computer, and after a short time, announced that he had met a lady on line and he was going to meet her. He was happy and excited and said that they were going to have sex. He left at 3:40 p.m. on foot.

Johnson was visiting with Pallaschke when Robinson returned around 6 that evening. Johnson looked out the window and saw Robinson get out of a car and carry bags into the mobile home that they shared. Robinson then came over to Pallaschke's home. He was agitated and told Pallaschke that the date "went real bad, real fast." When Johnson asked about the bags, Robinson said he stole some things. Then he said that he "killed them and stole all [their] stuff." He explained that another man had walked in and started a fight and the woman got in the way, and he ended up killing them both.

Robinson borrowed a phone from Pallaschke's roommate and called his cousin, Michael Souders, asking for a ride. Souders' wife picked Robinson up at his trailer home and took him to their house, where they had dinner together. Then, around 7:30 that evening, Robinson used their phone to call his mother, Cheryl Smith.

He was crying, and Smith asked him what was wrong. He replied, "I did something wrong." She responded, "What, did you kill somebody or hurt somebody?" He told her that he couldn't tell her on the phone, but he would text her. A few minutes later,

3

at 8:08 p.m., he sent her a text reading, "What you said is right, but don't say what it is. I'll come see you tomorrow. Love you always and forever."

Five minutes later he called her back. He wanted her to pick him up so he could tell her what had happened, and she told him, "If you hurt somebody or killed somebody, I have to call the cops to let them know." He then left the Souders' house on foot, leaving a bag containing a computer on the Souders' table. Smith's daughter later drove over and picked him up at the trailer where he was living.

When he arrived at his mother's home, he cried and hugged her and said it was an accident. He said he had stabbed somebody in the neck. He told her the name of the victim and explained that he had thrown scissors that stuck in her neck. A few minutes later, around 9:30 p.m., his mother called the police.

When police arrived at the victim's residence, they found her along the back wall of the apartment, lying face down on the floor between the bed and the wall. She was naked, and there was a large amount of blood in the area of her neck. A pair of kitchen shears was under her head.

Responding to Smith's call, police took Robinson into custody that evening. They conducted a lengthy interview with him, which was recorded and later played back for the jury. During the course of the interview, Robinson revised his description of the day's events several times, but his story stayed generally consistent. Using Pallaschke's computer, he made contact with the victim, O.S.B., on a website called Plenty of Fish. The two, who had never previously met or been in contact, chatted for about 10-15 minutes and agreed to a sexual encounter. He then walked over to her apartment. Within 3 minutes of his arrival, the two went to her bedroom, where they commenced having

4

sexual intercourse. According to Robinson, he had five orgasms in a variety of sexual positions.

He initially told detectives that after having sex, he dozed off and woke up on the floor with scissors in his hand. He didn't remember where he obtained the scissors and didn't remember stabbing her. He saw blood spurting from O.S.B.'s neck and immediately left the house in a panic.

He later explained that he became angry when O.S.B. was talking to him during sex and he grabbed the scissors out of a dresser drawer next to the bed. He only remembered stabbing her once. He reported that they had been having "rough" sex and she had scratched him on his neck and the two rolled off of the bed onto the floor, where she struck her head. He took her jewelry, phone, DVD player, some DVDs, and her computer and placed the items in three trash bags. He started walking back to his trailer, and a passerby gave him a ride the rest of the way.

Robinson subsequently amended his story yet again. This time, he explained that he was lying on top of O.S.B. engaging in anal intercourse when he apparently hurt her, causing her to say "ow" and roll over and scratch his neck. Both of them fell on the floor, with her landing first and hitting her head. He "snapped" when she scratched him, leading him to pound her head face-first onto the floor. He then ran into the kitchen, looked around, and grabbed a pair of kitchen shears. O.S.B. was still breathing, and he stabbed her once or twice with the scissors.

A coroner's report described extensive blunt-force injuries around O.S.B.'s face. There were pattern injuries on her neck consistent with nearby electric cords. There were also a total of nine puncture wounds consistent with open scissors and closed scissors; these wounds were around her neck and went into her spine and jugular vein. In the

5

coroner's opinion, death was caused by a combination of injuries—punctures, suffocation, and blunt force.

On December 20, 2012, the State filed a complaint/information charging Robinson with premeditated first-degree murder. The State subsequently amended the complaint/information to include charges of aggravated burglary and misdemeanor theft.

A trial was conducted from June 24 to 27, 2014. A jury found Robinson guilty of all three counts:  first-degree murder, aggravated burglary, and theft. Robinson subsequently filed an objection to sentencing under K.S.A. 2013 Supp. 21-6620, arguing that the oral notice given by the State was not reasonable notice of intent as required by the statute. He also filed a motion to discharge the trial jury, to stay sentencing proceedings, and to impanel a new jury that would be subject to voir dire questioning regarding imposition of a hard 50 sentence, as well as a motion to reopen voir dire and a motion objecting to the sentencing proceedings as violating ex post facto laws. These motions were denied. The jury then, in sentencing phase deliberations, reached a verdict endorsing a sentence of life imprisonment with parole eligibility after 50 years. The court sentenced Robinson to a hard 50 life sentence for murder, a consecutive sentence of 34 months for aggravated burglary, and a consecutive sentence of 12 months for theft. Robinson filed a timely notice of appeal.

ANALYSIS

Robinson presents this court with two sets of issues:  asserted errors related to trying the guilt phase and asserted errors related to the sentencing phase.

6

*Exclusion of Evidence of Other Online Postings by O.S.B.*

Robinson initially asserts that the district court committed reversible error when it excluded evidence of the victim's other computer dating contacts.

During the trial, the State asked for a late certification of a witness—a forensic computer analyst, who would testify about what he could recover from the computers that were used for the contact between O.S.B. and Robinson. The district court granted the late endorsement. Robinson then sought to introduce evidence from that analysis that may have shown a willingness by O.S.B. to engage in sex on first dates. The district court granted the State's objection to admitting that evidence, holding that the evidence was irrelevant and intrusive on the victim's privacy. Robinson now argues that the ruling prejudicially impaired his ability to present a defense.

Appellate courts apply a multistep analysis of decisions to admit or exclude evidence. Under this multistep analysis, the first question is relevance. K.S.A. 60-401(b) defines relevant evidence as evidence that is probative and material. On appeal, the question of whether evidence is probative is judged under an abuse of discretion standard; materiality is judged under a de novo standard. *State v. Shadden*, 290 Kan. 803, 817, 235 P.3d 436 (2010). Review of whether a trial court erroneously excluded evidence that is integral to the defendant's theory of his or her defense is de novo. *State v. White*, 279 Kan. 326, 331-32, 109 P.3d 1199 (2005).

Material evidence tends to establish a fact that is at issue and is significant under the substantive law of the case. Probative evidence requires only a logical connection between the asserted fact and the inference it is intended to establish. *State v. Hilt*, 299 Kan. 176, 189, 322 P.3d 367 (2014).

The State argued that Robinson committed premeditated murder. Robinson admitted that he killed O.S.B. but contended that he killed her in the heat of passion. The district court denied his request to introduce evidence suggesting that she let internet contacts know that she was amenable to sexual relations on first dates. Robinson contends that this evidence was relevant in that it undermined the State's theory of premeditation.

A criminal defendant has the right, under both the Kansas and United States Constitutions, to present the theory of his or her defense, and the exclusion of evidence that is an integral part of that theory violates the defendant's fundamental right to a fair trial. *White*, 279 Kan. 326, Syl. ¶ 3. In order to constitute error, the excluded evidence supporting the defense theory must be relevant, admissible, and noncumulative. *State v. King*, 293 Kan. 1057, 1063, 274 P.3d 599 (2012). A defendant's right to present evidence in support of a defense is subject to certain restraints:  the evidence must be relevant, and evidentiary rules governing admission and exclusion of evidence are applied. *State v. Roeder*, 300 Kan. 901, 927, 336 P.3d 831 (2014); see *State v. Jones*, 287 Kan. 547, 555, 198 P.3d 756 (2008).

The district court did not err in excluding the proffered evidence because it was not material. The State never attempted to prove that Robinson went to O.S.B.'s home for the purpose of forcing her to engage in sex with him. The State conceded that the sexual encounter may have been consensual and argued that the premeditation to kill took place after the sexual encounter began and was proven by the various means that Robinson used to exert violence against O.S.B., including looking for scissors with which to stab her.

During closing argument, the State made no effort to argue that Robinson was not invited into the victim's home:

8

"He may have entered [her home] consensually but at the point he's doing this [rifling through her personal effects], that consent is withdrawn. He's remaining in that apartment without her consent, that's what aggravated burglary is. One can infer that if you are killing or have killed someone that that consent to stay in your apartment is gone, right?"

In its rebuttal, the State reiterated that it was not attempting to show that the initial encounter between Robinson and the victim was nonconsensual:

"[I]f what the defendant said in summation is what happened, that we're having consensual sex—and as a side note, no one accused him of rape or sodomy, we have no evidence of that, we don't know that. No one has accused him of that, that we don't have to prove that."

In order to be material, evidence must tend to establish a fact that is at issue and is significant under the substantive law of the case. *Hilt*, 299 Kan. at 189. O.S.B.'s willingness or lack of willingness to have a sexual relationship with Robinson was not at issue, and the evidence was therefore not relevant. Furthermore, even if the defense had succeeded in introducing evidence showing that O.S.B. told other internet contacts that she was open to the possibility of sex on a first date, that would have had little bearing on whether Robinson forced her to have sex and then premeditated her murder in order to cover up the sex crime.

The present case is analogous to a situation presented in *State v. Gilbert*, 272 Kan. 209, 32 P.3d 713 (2001), where the defendant sought to introduce evidence about the victim's character to bolster an element of his defense. The court held:

9

"Gilbert again cites the Sixth Amendment in contending the trial court violated his right to a fair trial by refusing to allow him to delve into the character of the victim. He contends that showing the victim's dishonest character would have bolstered his defense that he was at the victim's house only to collect unpaid wages.

"In actuality, Gilbert's claim that Johnson owed him money was not in dispute. The only question was whether Gilbert broke into the victim's house with the intent to commit robbery. Whether he believed he was lawfully owed money is irrelevant." 272 Kan. at 212-13.

To be sure, Kansas law favors the admission of otherwise relevant evidence, and the exclusion of relevant evidence is an extraordinary remedy that should be used sparingly. *State v. Carr*, 300 Kan. 1, 214, 331 P.3d 544 (2014). Ultimately, however, nonconsensual sex was never asserted at trial by the State, and no evidence tended to prove that it occurred. Although Robinson essentially speculates that the jury speculated that the encounter was nonconsensual, the computer log that he wanted the jury to read rebutted no argument and no evidence put forward by the State.

The evidence that Robinson sought to introduce was not relevant, and we accordingly find no error in its exclusion.

*Prosecutorial Error*

Robinson submits that the prosecutor engaged in error with regard to the way he addressed three topics during closing argument. This court has adopted a two-part test for evaluating assertions of prosecutorial error. Under this test, we determine first whether the comments were improper and then whether any improper comments undermined the defendant's right to a fair trial:

10

"To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* ___ U.S. ___, 132 S. Ct. 1594 (2012)." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

Robinson submits that, during closing argument, the prosecutor misstated the evidence, misstated the law, and inflamed the passions of the jury.

He first contends that the prosecutor misstated the evidence by making frequent references to him "strangling" O.S.B. He argues that the verb "to strangle" necessarily means to cause death by cutting off the flow of oxygen. Dictionaries and common usage do not support this restrictive definition.

Webster's Third New International Dictionary (unabridged) 2256 (1967) defines "strangle" as: "1.a. to compress the windpipe of until death results from stoppage of respiration:  choke to death by compressing the throat with or as if with a hand or rope; 1.b. to interfere with or obstruct seriously or fatally the normal breathing of." The American Heritage Dictionary of the English Language 1775 (3d ed. 1992) defines the verb to strangle as "1.a. To kill by squeezing the throat so as to choke or suffocate; throttle. b. To cut off the oxygen supply of; smother." Under these definitions, death is a possible but not an essential element of strangulation.

In the context of legal usage, strangling does not require death but simply an attempt to shut off a victim's air supply. In *State v. Curreri*, 42 Kan. App. 2d 460, 461, 213 P.3d 1084 (2009), our Court of Appeals wrote that a defendant "then got on top of [the victim] and began to strangle her to the point that she almost lost consciousness." Interpreting a state statute, the Mississippi Supreme Court has held that even a temporary placement of the hand to the face so as to restrict breathing constitutes strangling. *Clark v. State*, 122 So. 3d 129, 133 (Miss. App. 2013).

The coroner testified that there were multiple linear marks around O.S.B.'s neck and that these probably were produced by the pressure of electrical cords around her neck. This action meets the dictionary definitions of strangling, in that the electrical cords pressing against her neck would restrict her airflow. There was evidence in the record that Robinson placed cords around O.S.B.'s neck tightly enough to leave marks, which leads to the permissible conclusion that he interfered with or obstructed seriously her normal breathing. The prosecutor's statements fell within both colloquial and legal understandings of what is meant by "strangling" and were consistent with the evidence.

Robinson next argues that the prosecutor misstated the law of premeditation. During closing argument, the prosecutor argued against Robinson's heat-of-passion theory. He argued that the complexity of the events pointed to an inference of premeditation. He devoted a significant portion of his argument to outlining the time that it took for Robinson to kill the victim and the multiple steps involved—hitting her head on the floor, searching for a suitable instrument, and then stabbing her multiple times.

During rebuttal, the prosecutor argued:

> "[H]e's thinking about killing her. That's why he gets the scissors. Whether he got them out of a bedroom drawer, the kitchen drawer, it doesn't matter. It's what he thinks to do and acts on it. It doesn't require a plan. Look up 'premeditation,' it doesn't require a plan.
>
> . . . .
>
> "Ladies and Gentlemen, there's premeditation because he thought about it before he did the act. It wasn't instantaneous with the act. That's all that's required."

On appeal, Robinson contends that the prosecutor improperly implied that premeditation is proven if the State shows that the motivating thought was not instantaneous with the action but preceded the action. Robinson refers to this court's holding in *State v. Jones*, 279 Kan. 395, 404-05, 109 P.3d 1158 (2005), that intention and premeditation are distinct concepts, and intention can endure over a period of time without necessarily turning into premeditation.

A defendant is denied a fair trial when a prosecutor misstates the law and the facts are such that the jury could have been confused or misled by the statement. *Hall*, 292 Kan. at 849.

Premeditation is a "state of mind" relating "'to a person's reasons and motives for acting as he or she did.'" *Hall,* 292 Kan. at 850. PIK Crim. 4th 54.150(d) defines premeditation as "to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life."

The prosecutor argued that the evidence supported the State's theory that Robinson thought over his plan of action and that Robinson, after pounding the victim's head on the

13

floor, must have formed the design to kill her when he searched for a stabbing instrument. The prosecutor's final statement in rebuttal, in isolation, may have over-simplified the law, but the State's theory was more sophisticated than "either instantaneous or premeditated." The closing argument, when viewed as a whole, did not misstate the law.

Finally, Robinson contends that the prosecutor's likening of the manner of theft to the work of Santa Claus improperly inflamed the jury's passions. During closing argument, the prosecutor argued that Robinson did not behave like someone in the thrall of passion when he searched the victim's residence and bagged her property for removal:

> "How did he act right afterwards? Pretty calm, cool and collected to wash up, get dressed and steal all her stuff like Santa Claus and bag her stuff."

Prosecutors are not allowed to make statements that inflame the passions or prejudices of the jury or distract the jury from its duty to make decisions based on the evidence and the controlling law. A prosecutor must guard against appeals to jurors' sympathies or prejudices. *Hall*, 292 Kan. at 853.

Robinson maintains that the prosecutor's reference to Santa Claus was unprofessional sarcasm. Although sarcasm may be used as an occasional rhetorical device, it cannot be used in such a way that it distracts the jury from its charge, demeans the adversarial trial process, or becomes unprofessional to the point of jeopardizing a verdict. *State v. Longoria*, 301 Kan. 489, 526, 343 P.3d 1128 (2015). The line between appropriate and inappropriate use of sarcasm is thin and easy to cross, and prosecutors should therefore avoid repeated use of the technique in most cases. 301 Kan. at 526.

14

In the present situation, the reference to Santa Claus is not so much sarcastic as inapt. In most narrations, Santa Claus does not "steal all one's stuff." The prosecutor may have been thinking of the Grinch, who disguised himself as Santa Claus in order to steal the Whos' presents. See Geisel (Dr. Seuss), *How the Grinch Stole Christmas*, Random House (1957). In any event, the passing reference bore little weight and was unlikely to have distracted the jury or jeopardized the jury verdict.

Even taken in their entirety, the three asserted instances of prosecutorial error did not mislead the jury or cause prejudice to Robinson.

*Sufficiency of the Aggravated Burglary Evidence*

Robinson argues that the evidence was insufficient to prove that he formed the intent to steal O.S.B.'s property while she was still alive.

When deciding whether the evidence sufficed to sustain a conviction, this court reviews all the evidence in the light most favorable to the prosecution and determines whether it is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Ward*, 292 Kan. 541, 581, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012).

At the time of the crime, K.S.A. 2013 Supp. 21-5807 defined aggravated burglary:

"(b) Aggravated burglary is, without authority, entering into or remaining within any building, manufactured home, mobile home, tent or other structure, or any vehicle, aircraft, watercraft, railroad car or other means of conveyance of persons or property in which there is a human being with intent to commit a felony, theft or sexually motivated crime therein."

15

Robinson correctly argues that, in order to qualify as an element of aggravated burglary, the "human being" referenced in the statute must be alive. In *State v. Kingsley*, 252 Kan. 761, 780-81, 851 P.2d 370 (1993), this court held that the crime of aggravated arson requires the presence of a living person in the structure that was burned. This was because the policy behind elevating arson to aggravated arson was the risk to human life and safety, a risk presented only when a living person was in the structure. 252 Kan. at 781. This court subsequently extended that reasoning to the crime of aggravated robbery, holding that a living victim is required at the time of the commission of the crime. *State v. Holt*, 260 Kan. 33, 41, 917 P.2d 1332 (1996). Similar reasoning supports Robinson's contention regarding aggravated burglary: the statute requires the presence of a living human being.

The dissenting opinion broadens the appellant's inquiry to include the question of whether Robinson remained in O.S.B.'s house without authority. However, Robinson does not raise, brief, or argue whether O.S.B. ever withdrew her consent for Robinson to remain in her home. In fact, Robinson appears to concede what the dissent advocates by maintaining that the evidence only supports a simple burglary conviction due to the lack of a human being's presence because all of the remaining elements of burglary exist.

The relevant question is: Does the record contain evidence sufficient to establish that O.S.B. was still alive when Robinson formed the intent to commit theft? The coroner testified that it was not possible to determine the exact cause of death because the force of her head being driven into the floor was causing suffocation while the stab wounds were causing rapid blood loss. He testified that, if blood leaked into the base of her brain, she might have died within seconds; if suffocation was a significant factor, then death might have occurred within 4 to 5 minutes, and; if blood loss was the primary cause of death, up to 30 minutes could have elapsed between the last injury and her death.

16

The jury was asked to make two findings involving an uncertain time relationship: how long was O.S.B. alive after the attack began and when did Robinson form the intent to steal her possessions? If the intent overlapped a time when she was still alive, then the statutory definition of aggravated burglary was proven.

According to Robinson's interview statement, O.S.B. was still breathing when he went looking for the scissors, and she was still bleeding from a neck wound after he stopped stabbing her. He described the blood as spurting from her neck, which would not have occurred if she was already dead at that time, and the evidence suffices to show that she was still alive when he left the vicinity of her body.

The State did not allege or argue that Robinson entered O.S.B.'s home with the intent to commit theft; instead, he formed that intent at some point during or after the attack. Robinson told detectives that he left the home hurriedly, almost right away, after the attack was completed. Given Robinson's own description of the events, which was played in open court, the evidence sufficed to allow a reasonable jury to conclude that he formed the intent to commit theft while she was still alive.

*Retroactive Application of 2013 Amendments to K.S.A. 21-6620*

When Robinson killed O.S.B., the version of K.S.A. 21-6620 called for the sentencing judge to determine whether to impose the hard 50 sentence. Such sentencing procedures have been found to be unconstitutional infringements on the Sixth Amendment right to trial by jury. *Alleyne v. United States*, 570 U.S. ___, 133 S. Ct. 2151, 2158, 186 L. Ed. 2d 314 (2013); *State v. Soto*, 299 Kan. 102, 119, 322 P.3d 334 (2014). The Kansas Legislature thereupon amended the statute to allow a jury to make the findings necessary for imposition of the hard 50 sentence. L. 2013, Sp. Sess., ch. 1, § 1. The legislature made the new procedure retroactive for proceedings that had not

17

concluded as of June 17, 2013. K.S.A. 2013 Supp. 21-6620(d). Robinson argues that his sentence was void because the original law was unconstitutional and any retroactive attempt to make it constitutional violates the federal constitutional prohibition on ex post facto laws.

After Robinson submitted his appellate brief, this court resolved the issue of retroactivity, holding that retroactive application of the amendments does not violate the Ex Post Facto Clause of the United States Constitution. *State v. Bernhardt*, 304 Kan. 460, Syl. ¶ 5, 372 P.3d 1161 (2016). This decision disposes of Robinson's issue adversely to his position.

*Limitation of Voir Dire Questioning*

Robinson contends that the district court prevented him from asking questions during voir dire relating to the penalty phase of the trial, which deprived him of his constitutional right to a fair trial.

The purpose of voir dire is to enable the parties to select competent jurors who are without bias, prejudice, or partiality. The nature and scope of the voir dire examination is generally entrusted to the sound discretion of the trial court. In determining whether the trial court has taken sufficient measures to assure that the accused is tried by an impartial jury free from outside influences, appellate courts independently evaluate the circumstances. *State v. Reyna*, 290 Kan. 666, Syl. ¶ 16, 234 P.3d 761 (2010), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016).

The district court exercises broad discretion in controlling voir dire in criminal cases. "Deference to the trial court's discretion is the hallmark of voir dire issues in criminal appeals." *State v. Hudgins*, 301 Kan. 629, 634, 346 P.3d 1062 (2015). In order to

18

obtain reversal based on a district court's limitation on voir dire, the appellant must demonstrate both that the district court abused its discretion and that the appellant was prejudiced by that limitation. 301 Kan. at 634.

In order to fulfill the purpose of enabling the parties to select competent and impartial jurors, the district court necessarily must reasonably maintain its authority to control voir dire, even to speed up the process. *Hudgins*, 301 Kan. at 635. The court also has the discretion to decide when voir dire questioning is improper because it does not concern the jury's function in the case. 301 Kan. at 635.

K.S.A. 22-3408(3) provides for the examination of prospective jurors and authorizes the district court to limit that examination:

> "The prosecuting attorney and the defendant or his attorney shall conduct the examination of prospective jurors. The court may conduct an additional examination. The court may limit the examination by the defendant, his attorney or the prosecuting attorney if the court believes such examination to be harassment, is causing unnecessary delay or serves no useful purpose."

Prior to voir dire, Robinson requested "the leeway during voir dire to question jurors about their ability to serve on a jury in which they will be part of the sentencing process." Arguing in support of the request, he analogized the process to inquiries about imposing the death penalty and asserted that certain jurors might have preconceptions about certain mitigating factors. The district court denied the request.

After the conviction and prior to sentencing, Robinson filed a motion seeking to reopen voir dire. The motion requested permission to inquire on the limited issues

19

"as to whether any member of the jury has already determined the appropriate punishment in this case, if they are leaning toward a particular punishment, whether they still possess the ability to set aside any preconceived ideas and decide the sentence only on the evidence presented after appropriately weighing the aggravating fact offered by the State and mitigating factors offered by the Defendant."

In capital cases, defendants have a limited right to make voir dire inquiries regarding prospective jurors' predetermined votes during penalty-phase deliberations. In *Morgan v. Illinois*, 504 U.S. 719, 728, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992), the Supreme Court held that it would be an unconstitutional deprivation of the right to a fair trial if any juror were impaneled in a capital case who would automatically vote in favor of the death penalty in every case. Robinson seeks to extend that holding to jurors who might absolutely refuse to consider mitigating factors in noncapital sentencing decisions.

Rules derived from capital cases do not necessarily carry over into other felony trials. See, *Rummel v. Estelle*, 445 U.S. 263, 274, 100 S. Ct. 1133, 63 L. Ed. 2d 382 (1980) (punishment in death penalty cases has a unique nature that requires different analysis from other felony sentences); *e.g.*, *Gardner v. Florida*, 430 U.S. 349, 357-58, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977) ("death is a different kind of punishment from any other which may be imposed in this country"); *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976) ("the penalty of death is qualitatively different from a sentence of imprisonment, however long").

In the present case, Robinson requested that a pre-voir dire jury instruction be given. The request related to the anticipated bifurcated sentencing proceeding and that he be allowed to ask jurors whether they could "weigh with equal import aggravators and mitigators" and that was why "the subject matter of emotional disturbance, mental illness" should be open for inquiry. He asserted the right to question jurors about their views on mental illness evidence so that he could develop whether a juror had a "bias or

20

prejudice against a particular kind of mitigation and couldn't be fair in weighing that defense factor against the State's aggravator."

The State stated its concern that Robinson was attempting to bring in through the back door a suggestion that Robinson was psychologically or mentally impaired, which could have a bearing on the determination of guilt. The district court denied Robinson's requests. The court stated that matters should not be brought up in voir dire that would be excluded at trial. The court allowed counsel for both sides to inquire whether jurors could sit in judgment of someone else even if it might entail sentencing a defendant.

In effect, Robinson wanted the district court to allow him to inquire about specific mitigating factors. This court has taken the position that a defendant does not have a constitutional right to case-specific mitigation questioning during voir dire. *State v. Robinson*, 303 Kan. 11, 146-47, 363 P.3d 875 (2015). In support, the court cited cases from other jurisdictions, both state and federal, and quoted *United States v. Wilson*, 493 F. Supp. 2d 402, 406 (E.D.N.Y. 2006), which held that allowing voir dire on specific types of mitigation or aggravation evidence does "'not serve the goal of uncovering impermissible bias, but only beg[s] follow-up questions that trend toward stake-out or pre-commitment questions.'" *Robinson*, 303 Kan. at 147.

Such questions are not permitted in capital cases, and they are even less appropriate in noncapital cases. Our caselaw disfavors the area of questioning that Robinson sought to pursue, which presented the "staking" danger against which *Robinson* warned.

We do not formulate an absolute rule that a party in a criminal proceeding may never make inquiries that touch on mitigation. In the present case, however, Robinson did not proffer specific questions, and we cannot conclude that the district court's restriction

21

on questions relating to the sentencing phase was unreasonable. Robinson fails to establish a constitutional right to inquire about specific mitigating factors during voir dire, and there are policy reasons for not recognizing such a right. The district court was on firm legal footing in denying the requested questions, and it did not abuse its discretion.

*Adequacy of Sentencing Notice*

Robinson argues that the State failed to provide him with constitutionally satisfactory notice that it would seek a hard 50 sentence. Whether a procedure provides constitutionally adequate due process is subject to de novo review on appeal. See *Dunn*, 304 Kan. at 819.

K.S.A. 2013 Supp. 21-6620(c)(1) governs requests by the State to impose hard 50 sentences:

> "If a defendant is convicted of murder in the first degree based upon the finding of premeditated murder, *upon reasonable notice by the prosecuting attorney*, the court shall conduct a separate sentencing proceeding in accordance with this subsection to determine whether the defendant shall be required to serve a mandatory minimum term of imprisonment of 40 years or for crimes committed on and after July 1, 1999, a mandatory minimum term of imprisonment of 50 years or sentenced as otherwise provided by law." (Emphasis added.)

The statute does not define what makes notice "reasonable." Under the Sixth Amendment right to be informed of the nature and cause of accusations, a defendant must be given notice and a useful opportunity to respond. *State v. Scott*, 286 Kan. 54, 102, 183 P.3d 801 (2008), *overruled on other grounds by Dunn*, 304 Kan. 773.

On June 5, 2014, approximately 2 weeks before the trial began, the district court judge sent counsel for both Robinson and the State a letter. In this letter, the judge stated:

> "The defendant has received notice that the state is intending to pursue the 'hard 50' (if defendant is convicted of first degree premeditated murder) via a plea letter and then later in an informal hearing between court and counsel on May 23, 2014, at which time the prosecuting attorney confirmed that he would be pursuing the 'Hard 50.' While the State has not filed official notice, the defendant is certainly aware of the State's intention which is obviously contingent upon a first degree murder conviction.

> "In further review of the statute and in consideration of [defense counsel] Ms. Spainhour's concern regarding preparation for the sentencing phase, this court's intention is to continue the sentencing phase (if such proceeding is necessary) to allow reasonable and adequate time for preparation by both the State and defendant's counsel."

The plea letter to which the court referred was sent on May 19, 2014, explaining that, if the parties did not reach an agreement, the State would seek the maximum penalty under the law, which might include the hard 50.

It thus appears from the record that Robinson had notice approximately 1 month before the trial began that the State would seek a hard 50 sentence if it obtained a conviction for premeditated murder. It was in response to this notice that Robinson sought to ask questions during voir dire about mitigating factors. To be sure, the State also made some ambiguous statements at voir dire about its intentions, indicating that it might back away from the hard 50 request after the trial, but Robinson and the court were on notice that it was the State's intention to seek the enhanced sentence.

K.S.A. 2013 Supp. 21-6620(c)(1) allows the State to provide notice that it will seek a hard 50 sentence "[i]f a defendant is convicted of murder in the first degree based

23

upon the finding of premeditated murder." This language implies that the State may wait until after a conviction is obtained to provide the reasonable notice.

Immediately after the verdict was announced, on June 30, 2014, the district court asked the State whether it would be seeking a hard 50 sentence. The court insisted that the State provide the aggravating factors at that time in open court. The State responded that it would seek the enhanced sentence and that the grounds would be that the crime was heinous, atrocious, and cruel. The court then set sentencing for July 28. In response to motions from Robinson's counsel, the district court subsequently continued the sentencing proceeding to November 3, 2014, more than 4 months after the State declared in open court that it would seek the enhanced sentence.

Robinson accuses the State of "gamesmanship" and engaging in a "maybe we will, maybe we won't" approach to notice. The record shows, however, that well before trial the State informed Robinson and the court of its intention to seek the maximum penalty. The intention was reiterated after the trial, as allowed by statute.

This court has held that no particular form of notice of intention to invoke sentence-enhancing statutes is required and, in the absence of a contrary statutory requirement, oral notice will suffice. *Brown v. State*, 198 Kan. 345, 347, 424 P.2d 576 (1967) (habitual criminal act invocation). In *Brown*, orally informing the defendant's trial counsel several times before trial that, if the trial resulted in a conviction, the prosecution would invoke the habitual criminal act sufficed to provide reasonable notice. 198 Kan. at 347.

Robinson directs the court's attention to *State v. Bailey*, 251 Kan. 156, 167-69, 834 P.2d 342 (1992). In *Bailey*, the court stated that notice given at the time of arraignment that the State would seek a hard 40 sentence would serve the purpose of allowing a

24

defendant to plan a responsive strategy. The *Bailey* court was applying a statutory scheme that required written notice at the time of arraignment, which this court held to be sufficient. *Bailey* did not, however, hold that sufficient notice must necessarily be given at arraignment; it simply held that the legislative requirement of notice at arraignment was constitutionally adequate. 251 Kan. at 167-69.

Robinson asserts no particular prejudice resulting from the alleged inadequacy of the notice. Robinson presented an expert witness at the sentencing phase who testified about his psychological condition; it has not been proffered that he would have presented a different witness or additional or better-prepared witnesses if given more time.

Robinson was on notice prior to trial that a hard 50 sentence was a possibility. The State augmented that notice by informing Robinson and the court that it would likely seek a hard 50 sentence. After the guilty verdict was announced, the State gave immediate notice that it would be asking for a hard 50 sentence, which complied with the K.S.A. 2013 Supp. 21-6620(c)(1) requirement. Robinson was given additional time to prepare for the sentencing-phase hearing. Under the circumstances of this case, the notice was reasonable and conformed to constitutional prescripts.

*Cumulative Error*

As a final matter, Robinson urges us to find cumulative error that was prejudicial to his rights. We conclude, however, that no error was committed.

CONCLUSION

The verdict and sentence are accordingly affirmed.

25

JOHNSON, J., concurring in part and dissenting in part: I disagree with the majority's determination that the evidence was sufficient to support Robinson's conviction for aggravated burglary. The majority ignores an important element of the crime and fails to apply its stated standard of review.

PIK Crim. 4th 58.130 sets forth the elements of the crime of aggravated burglary, and, relevant to the facts of this case, they are:

"1.     The defendant remained in a house.

"2.     The defendant did so without authority.

"3.     The defendant did so with the intent to commit a theft therein.

"4.     At the time there was a human being in the house.

"5.     This act occurred on or about the 19th day of December, 2012, in Shawnee County, Kansas."

The majority only looks at the particular evidence that it finds relevant to the third and fourth elements, *i.e.*, whether Robinson formed the intent to commit theft while the victim was still alive. That myopic view ignores the elements that are the very foundation of burglary—as opposed to the elements of theft or robbery—which specific burglary elements are remaining in the house without authority.

The majority acknowledges, "[T]he State made no effort to argue that Robinson was not invited into the victim's home." Slip op. at 8. Accordingly, Robinson would have had authority to enter into the victim's apartment and remain therein until "after consent to an otherwise lawful entry has been withdrawn." *State v. Mogenson*, 10 Kan. App. 2d

26

470, 475, 701 P.2d 1339 (1985). "The paradigmatic example of remaining within may occur when (a) a defendant's initial entry into a building was authorized; (b) *authority is later withdrawn*; and (c) defendant nevertheless stays inside the building." (Emphasis added.) *State v. Gutierrez*, 285 Kan. 332, 337, 172 P.3d 18 (2007).

Here, the State presented no evidence that O.S.B. withdrew her consent for Robinson to enter into and remain within her apartment. Indeed, depending upon which of the coroner's scenarios actually occurred, O.S.B. may well have been unconscious or dead before she could have withdrawn Robinson's authority. Instead, the prosecutor simply told the jury that it could infer that if Robinson was killing or had killed O.S.B., then his consent to be in the house was gone. Pointedly, the State provides no authority for the proposition that an invitee's conduct can, as a matter of law, unilaterally cancel his or her authority to remain within a building, without regard to the inviter's wishes. Not only does that proposition turn the concept of consent on its head, but it would be impracticable to apply. At what point during a consensually rough sexual encounter does the guest become a potential burglar?

The majority suggests that it does not need to consider whether the evidence was sufficient to support a jury finding that Robinson remained within the building without authority because Robinson only challenged the presence of a human being during the burglary and because Robinson appeared to concede that "all of the remaining elements of burglary exist." Slip op. at 16. Both excuses for convicting a person of a crime that the State failed to prove beyond a reasonable doubt are untenable.

First, it is important to remember that the State has the burden to prove, beyond a reasonable doubt, each and every element of the charged crime; the defendant has no obligation to disprove the existence of any element. Here, Robinson raised the issue that the evidence was insufficient to convict him of the crime with which he was charged. In

27

that respect, the majority correctly states our standard of review, to-wit: "[T]his court reviews all the evidence in the light most favorable to the prosecution and determines whether it is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." Slip op. at 15. The standard requires us to review *all the evidence*, not just that evidence which might support one of the elements of the crime. Further, the determination that we must make is whether a rational jury could have found Robinson *guilty*. For the jury to bring in a guilty verdict, it must find that the State proved *all* of the elements of the charged crime beyond a reasonable doubt. The majority's being convinced that a rational factfinder could have reasonably found that O.S.B. was alive when Robinson formed the intent to commit theft is not the same as being convinced that a rational jury would have convicted him of aggravated burglary. In other words, we must find sufficient evidence in the record to support a *conviction*, not simply sufficient evidence to support one of the elements of the crime.

Without evidence from which a rational jury could reasonably infer that O.S.B. withdrew her consent for Robinson to remain within her apartment, the State failed to prove the essential elements of burglary. Without evidence to support a fundamental element of the crime of burglary, then a rational factfinder could not have found Robinson guilty of aggravated burglary beyond a reasonable doubt, even if it determined that O.S.B. was alive when Robinson formed the intent to steal. The most that is proved by Robinson's formation of an intent to commit theft while O.S.B. was alive is that Robinson may have committed a theft.

The majority's second reason for dodging the question of the sufficiency of the evidence to *convict* Robinson is its belief that his counsel apparently conceded that the evidence was sufficient to support a burglary conviction. But the objective determination of whether a jury could reasonably convict the defendant based upon the admitted evidence presents a legal question. *Cf. State v. Gallegos*, 286 Kan. 869, 873, 190 P.3d

28

226 (2008) (objective determination as to whether a jury could reasonably convict the defendant of a lesser included offense is a legal question). Legal questions "'must rest upon the court, uninfluenced by stipulations of the parties.'" *State v. Dickey*, 301 Kan. 1018, 1032, 350 P.3d 1054 (2015). In other words, a party's concession on a point of law does not bind this, or any other, court. See *Ritchie Paving, Inc. v. City of Deerfield,* 275 Kan. 631, 641, 67 P.3d 843 (2003) ("Stipulations as to what the law is are not effective and not controlling on this court."). In short, I would reverse Robinson's aggravated burglary conviction as being unsupported by the evidence.

With respect to the adequacy of the hard 50 sentencing notice, I concur in the result, only because the district court granted the defense liberal continuances to prepare for the sentencing phase. Perhaps it would have been better practice to permit an additional voir dire, once the State committed to having a sentencing phase, but I would not reverse on that omission in this case.

But I do take issue with the majority's cherry-picking only selected portions of the record to refute the defense argument that the State engaged in a "maybe we will, maybe we won't" approach to notice. The gamesmanship of which Robinson complains is revealed in the transcript of the arguments on Robinson's request to voir dire the guilt-phase jury about its potential role in the sentencing phase. The prosecutor responded: "[C]art way before the horse here because we have not provided notice, we're not going to start questioning the jury about something that may never happen because we have the right not to seek the Hard 50." That does not sound to me as if "well before trial the State informed Robinson and the court of its intention to seek the maximum penalty." Slip op. at 24. Rather, the State is claiming it might not seek the hard 50, as an argument in support of its effort to limit defense voir dire. I would characterize that as maybe the

29

State will, but maybe the State will not, depending on which way benefits the State. I find that to be contrary to the spirit, if not the letter, of the notice requirement.